**In re: ADOPTION OF M.E.P.**
**(Born: 12/24/00)**

**Appeal of: D.L.P., Children and Youth Services of Westmoreland County, J.C., Natural Father.**

Superior Court of Pennsylvania.

Argued March 25, 2003.
Filed May 29, 2003.

---

James A. Wells, Greensburg, for M.E.P.

Eileen C. Billey, Greensburg, for D.L.P.

Charles F. Wade, Greensburg, for CYS of Westmoreland County.

BEFORE: JOHNSON, KLEIN and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 D.L.P. (Mother) appeals the order entered on June 18, 2002, in the Court of Common Pleas of Westmoreland County that involuntarily terminated her parental rights in her minor child, M.E.P. Upon review, we affirm.

¶ 2 The relevant facts and procedural history are as follows: Mother gave birth to M.E.P. on December 24, 2000. Mother and the child's father, J.V.C. (Father), were unmarried at the time of M.E.P.'s birth and remain unmarried.[1] Mother was 31 years of age at the time of M.E.P.'s birth, resided continuously in her parents' home and is mentally handicapped. Two days after M.E.P. was born, on December 26, 2000, the Westmoreland County Children's Bureau (WCCB) assumed custody of M.E.P. when it became apparent that Mother was unable to care for him. Following discharge from the hospital on December 28, 2000, WCCB placed M.E.P. with a foster family. M.E.P. suffered from gastroesophagal reflux, sleep apnea and required surgery to correct a hernia.

¶ 3 On January 5, 2001, WCCB developed a Family Service Plan with specific goals for Mother to complete before she could achieve the ultimate goal of unification. The First Permanency Review Hearing was held on January 9, 2001, and an Order of Adjudication of Dependency was entered with the consent of Mother and J.V.C. Mother did not appeal the Order. Thereafter, WCCB contracted with Westmoreland Human Opportunities (WHO) to supervise visitation between Mother and M.E.P. and to provide parenting training for Mother as part of her Family Service Plan. Mother began to visit M.E.P. at the foster family's home two times per week for two hours per visit until early 2002, when they changed to one two-hour visit per week. Mother's WHO caseworker, Sue Reagan, attempted to teach Mother parenting from a book at visitations with Mother at her home once per week. M.E.P.'s maternal Grandmother (Grandmother) interfered with Ms. Reagan's parenting lessons and prevented her from reading the material slowly with Mother as Mother required. Ms. Reagan attempted to read with Mother during visits, but Mother lost interest quickly. Therefore, Ms. Reagan attempted to teach Mother *via* hands-on parenting lessons.

¶ 4 Prior to the Second Permanency Review Hearing on July 5, 2001, Carol Patterson, a psychologist referred by WCCB, evaluated Mother voluntarily on three separate occasions. After administering Mother an Intelligence test, Patterson found that Mother functions at an "extremely low" level of intellectual ability that presented cause for concern about Mother's ability to comprehend and solve problems.[2] According to Ms. Patterson, Mother learned best by a concrete example or by "modeling." Ms. Patterson's report indicated that it would be difficult for her to learn the problem-solving skills that she would need to learn to care for a child independently. After analyzing Appellant, Ms. Patterson found that Mother's personality tended toward dependency as indicated by her significant dependency on her parents.

¶ 5 At the Second Permanency Review Hearing on July 5, 2001, the Master made the recommendation that M.E.P. was to remain in foster care. The Master also recommended that Mother was to obtain her own residence so that WCCB and WHO caseworkers could offer family training in her home without Grandmother's interference. During visits by WHO and WCCB caseworkers, Grandmother was

---

1. Father did not contest the Petition to Terminate and is not part of this litigation. Father is mentally handicapped, lives in a supervised living apartment and is unable to provide for his own needs without assistance. Father exhibited sporadic interest in M.E.P. but took very few steps to establish a relationship between himself and M.E.P.

2. Mother's Intelligence Quotient (IQ) was 62. Ms. Patterson's report states that a score of this level indicates a possible deficit in cognitive function.

verbally combative and forbade several caseworkers entry into her home. The Master found that Mother was making some progress at the parenting sessions, but recommended that she had to continue the training sessions and attend individual counseling until discharged. On July 12, 2001, the trial court approved the Master's recommendations. Mother did not object to the trial court's adoption of Master's recommendations.

¶ 6 From the period between the Second Permanency Review Hearing on June 5, 2001, to WCCB's placement review on January 7, 2002, several caseworkers from WCCB and WHO made attempts to aid Mother in obtaining independent assisted housing and welfare assistance. The caseworkers emphasized to Mother the need for Mother to move out of her parents' home and apply for welfare assistance so that she could be independent from Grandmother and to make her own life decisions. Mother agreed and understood but attempted to address these issues without confronting Grandmother directly. In fact, Mother feared Grandmother's disapproval to such a degree that she scheduled meetings with social assistance services for housing and welfare during scheduled visits with M.E.P., and she had mail from the aforementioned services sent to the WHO offices. Despite these efforts, Mother cancelled or failed to attend any appointments with the charitable organizations that were contacted to assist Mother with obtaining alternate housing.

¶ 7 WCCB desired Mother to obtain new housing for herself as part of her Family Service Plan also as a result of the condition of Mothers' parents' home. Caseworkers from WCCB and WHO who attempted to visit Mother at her parents' home found the home to be unsuitable to raise a child. The caseworkers described the rugs of the home as dirty with peeled paint chips and pipe tobacco. The house was being heated in part from heat from an open stove and the bathrooms and kitchen were unsanitary. Open vents in the upstairs were large enough that a small child might fall through them and injure itself. Finally, Grandmother was unable to assist in raising M.E.P. because she cared for her disabled husband and mentally handicapped son full-time.

¶ 8 During the period between July 5, 2001, and January 7, 2002, Mother demonstrated that she was unable to retain and build on what she learned in the parenting training sessions with Ms. Reagan. Mother's lack of progress in developing parenting skills became more pronounced as M.E.P. grew older and new child developmental issues, such as walking, surfaced. Ms. Reagan was concerned that Mother was unable to parent the child on a permanent basis because Mother was unable to understand basic child development and parent-child bonding. At the visits, Mother rarely played with the child or fed him because she forgot to bring baby food to the visitation sessions. Mother exhibited little interest in bonding with M.E.P., preferring to watch television and allow the child to play on its own. Ms. Reagan observed two occasions at the visits where Mother's careless handling of M.E.P. resulted in him hitting his head on the floor. Finally, Mother expressed very little interest in progress reports received about M.E.P. from M.E.P.'s foster mother.

¶ 9 Therefore, on January 7, 2002, at WCCB's placement review, caseworker Frank Marscelli concluded that Mother made little progress in her Family Service Plan. Mr. Marscelli found that Mother demonstrated slow progress in the supervised visits and did not complete counseling or undertake efforts to obtain new housing or welfare assistance. As a result, Mr. Marscelli felt that Mother's ultimate goal of reunification with M.E.P. was un-

realistic because she was unable to care independently for the child or take steps to ensure a stable, safe environment for the child's upbringing. Therefore, in order to effectuate Mother's goal of reunification with M.E.P., Mr. Marscelli amended Mother's Family Service Plan to instruct Mother to do the following: (1) live independently and display positive nurturing behavior; (2) improve the safety of M.E.P.; (3) make a self-referral to an independent assisted living program; and (4) fill out the proper paperwork to obtain welfare assistance. Mr. Marscelli also felt that if the above goals were not completed by April, 2002, WCCB would change the ultimate goal for M.E.P. from reunification with Mother to permanent adoption.

¶ 10 The Third Permanency Review Hearing was held on January 9, 2002. The Master found that Mother was unable to grasp or implement basic parenting concepts despite continuous hands-on instruction. The Master also found that Mother refused individual counseling services, refused to move from her parents' home and refused to obtain welfare assistance in accordance with her Family Service Plan. Therefore, the Master recommended that WCCB file a Petition to Terminate parental rights and that M.E.P. be placed for adoption as soon as possible. The trial court adopted the Master's findings and recommendation on January 12, 2002.

¶ 11 WCCB filed a Petition to Terminate parental rights on February 21, 2002. The trial court appointed Eileen C. Billey, Esq., as counsel for Mother, and Harry F. Smail, Jr., Esq., as counsel for Father, and James Wells, Esq., as child advocate for M.E.P. A hearing was scheduled for May 15, 2002, but was later continued to June 17, 2002. At the hearing, Father relinquished his parental rights voluntarily. On June 18, 2002, the trial court granted the Petition and terminated involuntarily Mother's parental rights pursuant to 23 Pa.C.S.A §§ 2511(a)(1), (2), (5) and (8) and § 2511(b). Through appointed counsel, Mother filed a timely Notice of Appeal to this Court on July 3, 2002. The trial court ordered Mother to file a Pa.R.A.P. 1925(b) Concise Statement of Matters Complained of on Appeal. Mother complied with the trial court's order, and the trial court authored an Opinion pursuant to Pa.R.A.P. 1925(a) that addressed Mother's issues.

¶ 12 Mother presents the following questions for our review:

I. Did the Orphans' Court misapply the statute when it found [Mother] had failed to perform parental duties and did not have the capacity to learn?

II. Did the Orphans' Court err when it found that the conditions which led to [M.E.P.'s] removal continued to exist and termination of [Mother's] parental rights would best serve [M.E.P.'s] needs and welfare of the child without consideration of emotional bonds?

III. Did the Orphans' Court err when it found that [WCCB] [ . . . ] clearly and convincingly establish[ed] that termination would be in the best interests of [M.E.P.]?

IV. Did the Orphans' Court err when it found that Mother could not remedy those conditions which led to [M.E.P.'s] removal and that they continue to exist?

Mother's brief, at ii.

 ¶ 13 Our standard of review for an appeal from the grant of a Petition to Involuntarily Terminate Parental Rights is as follows:

In reviewing an involuntary termination of parental rights, we must "employ a broad, comprehensive review of the record" in order to determine whether the termination order is supported by com-

petent evidence. *In re Adoption of T.M.F.*, 392 Pa.Super. 598, 573 A.2d 1035, 1044 (Pa.Super.1990) (*en banc*); *Matter of Adoption of G.T.M.,[* 483 A.2d 1355 (Pa.1984)*] supra.* "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the findings of the Orphans' Court, [we] will not reverse a hearing court's decision to terminate." *In re Shives,* 363 Pa.Super. 225, 525 A.2d 801, 802 (Pa.Super.1987). While the scope of review is broad, we are limited to determining whether the order is supported by competent evidence and whether the court adequately considered the effect of such decree on the welfare of the child. *In the Interest of L.S.G.,* 2001 PA Super 22, 767 A.2d 587 (Pa.Super.2001). This court will affirm if competent evidence supports the trial court's findings, even if the record could also support the opposite result. *Id.* at 590.

*In Re: J.T. and R.T.,* 817 A.2d 505, 508–09 (Pa.Super.2003).

¶ 14 As stated above, WCCB filed the Petition to terminate Mother's parental rights pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5) and (8) and § 2511(b). Title 23 Pa.C.S.A. § 2511 states, in pertinent part:

 (a) GENERAL RULE.—THE RIGHTS OF A PARENT IN REGARD TO A CHILD MAY BE TERMINATED AFTER A PETITION FILED ON ANY OF THE FOLLOWING GROUNDS:

 (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

 (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

 (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

 (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

 (b) OTHER CONSIDERATIONS.—THE COURT IN TERMINATING THE RIGHTS OF A PARENT SHALL GIVE PRIMARY CON-

SIDERATION TO THE DEVELOPMENTAL, PHYSICAL AND EMOTIONAL NEEDS AND WELFARE OF THE CHILD. THE RIGHTS OF A PARENT SHALL NOT BE TERMINATED SOLELY ON THE BASIS OF ENVIRONMENTAL FACTORS SUCH AS INADEQUATE HOUSING, FURNISHINGS, INCOME, CLOTHING AND MEDICAL CARE IF FOUND TO BE BEYOND THE CONTROL OF THE PARENT. WITH RESPECT TO ANY PETITION FILED PURSUANT TO SUBSECTION (A)(1), (6) OR (8), THE COURT SHALL NOT CONSIDER ANY EFFORTS BY THE PARENT TO REMEDY THE CONDITIONS DESCRIBED THEREIN WHICH ARE FIRST INITIATED SUBSEQUENT TO THE GIVING OF NOTICE OF THE FILING OF THE PETITION.

¶ 15 Mother's first claim challenges the applicability of 23 Pa.C.S.A. § 2511(a)(1) and (a)(2). In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), the following must be demonstrated through clear and convincing evidence: that for a period of at least six months prior to the filing of the petition, the parent's conduct demonstrates an settled purpose to relinquish parental rights or that the parent has refused or failed to perform parental duties. *See* 23 Pa.C.S.A. § 2511(a)(1). In order to terminate parental rights pursuant to 23 Pa.C.S.A § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In Re: M.J.C.*, 438 Pa.Super. 529, 652 A.2d 936 (1995).

¶ 16 After a thorough review of the record, we are satisfied that the trial court did not err when it determined that Mother was incapable of learning parental skills, that she failed to perform parental duties and would be unable to learn to perform them in the future. We note that it is uncontested that WCCB removed M.E.P. from Mother's custody since his birth, a period greater than six months prior to the filing of the petition to terminate parental rights.

¶ 17 Carol Patterson, the psychologist that evaluated Mother and M.E.P., offered the following uncontradicted testimony at the termination hearing: Mother's intellectual functioning and problem solving capabilities were in the extreme low percentile of the standard psychological testing criteria and her personality make-up demonstrated many dependencies, especially toward her parents, with whom she resided continuously. N.T. Trial, 6/17/2002, at 10. As a result, Mother would be unable to live alone for the rest of her life. *Id.* at 10, 16. Ms. Patterson's report recommended individual therapy for Mother to address her dependency issues and coping skills. When Ms. Patterson analyzed Mother and M.E.P., M.E.P. was 5 months old, and, at that early stage of development, Mother perceived M.E.P. as having characteristics that would make parenting difficult. *Id.* at 10. Ms. Patterson concluded that in order to parent M.E.P. capably, Mother would require 24–hour intensive parenting assistance until M.E.P. reached adulthood. *Id.* at 12. This parenting assistance would be necessary because M.E.P. would be unsafe in her home. *Id.* Finally, Ms. Patterson testified that such permanent parenting assistance would result inevitably in another person raising M.E.P. instead of Mother. *Id.* at 15. The trial court found Ms.

Patterson's testimony credible, and we will not disturb that credibility finding on appeal. *See Brotzman–Smith v. Smith*, 437 Pa.Super. 509, 650 A.2d 471, 474 (1994).

¶ 18 Ms. Reagan's report of May 15, 2002, was admitted into evidence at the termination hearing. The report indicated that Mother expressed little interest in interacting with M.E.P., other than changing his clothes and bottle-feeding. *See* WHO Report, 5/15/2002. The report also indicated that Mother preferred to allow M.E.P. to roam the room and play on his own, and Ms. Reagan directed Mother repeatedly to play with M.E.P. *Id.* At the termination hearing, Ms. Reagan testified that the child recognized Mother, as he would any other person that transported him to the supervised visits, but Ms. Reagan did not feel that M.E.P. would miss Mother if she did not visit him. N.T. Trial, 6/17/2002, at 25. Ms. Reagan also testified that she felt M.E.P. was bonded with his primary caretaker in foster care. *Id.* at 24. The trial court found Ms. Reagan's testimony credible, and we will not disturb that credibility finding on appeal. *See Smith*, 650 A.2d at 474.

¶ 19 We glean from Mother's testimony that she took several measures to remedy her situation following WCCB's filing of the Petition to Terminate. N.T. Trial, 6/17/2002, at 182. Mother started to receive Supplemental Security Income (SSI) benefits and made small repairs to her parents' home. *Id.* at 169. Mother also obtained an apartment but did not move into it because she didn't have the money. *Id.* at 184. However, Mother intended to move back in with her parents after their home was repaired. *Id.* at 185. When questioned regarding her refusal to obtain counseling, Mother responded that she would not accept help from anyone other than Calvin Parker, Frank Marscelli, her attorney and Grandmother. *Id.*

¶ 20 Thus, the overwhelming body of testimony and evidence presented by WCCB at the termination hearing satisfies this Court that the trial court did not err when it found that Mother, with intense hands-on assistance, did not learn and apply proper parenting skills during M.E.P.'s 18–month stay in foster care and could not learn proper parenting skills in the future. These deficiencies were exacerbated by her dependency on Grandmother, Mother's refusal to leave her parents' home and refusal to obtain individual counseling. *See* Trial Court Opinion, 9/19/2002, at 19. Mother's slight remedial measures, taken *after* WCCB filed its Petition to Terminate, were not sufficient to indicate to the trial court that she wished to learn or apply proper parenting techniques in raising M.E.P. *See* 23 Pa.C.S.A. § 2511(b) (court will not consider remedial measures taken after Petition to Terminate filed pursuant to 23 Pa.C.S.A § 2511(a)(1) or (8)). Accordingly, we find that the trial court did not err when it determined, pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (a)(2), that Mother failed to perform parental duties and would be unable to learn them in the future.

¶ 21 Next, we consider whether the trial court erred when it found that termination was proper pursuant to 23 Pa.C.S.A. § 2511(a)(5) and § 2511(b). In order for termination pursuant to 23 Pa.C.S.A. § 2511(a)(5) to be proper, the following factors must be demonstrated: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to the child's removal or placement continue to exist; (3) the parents cannot or will not remedy the conditions which led to removal or placement within a reasonable period of time; (4) the services reasonably available to the parents are unlikely to remedy the conditions which led to removal or placement within a reasonable period of time; and (5) termination

of parental rights would best serve the needs and welfare of the child. *See In Re: B.J.R.*, 397 Pa.Super. 11, 579 A.2d 906, 908 (1990).

¶ 22 In the present case, the undisputed facts indicate that WCCB took M.E.P. into their custody, and M.E.P. remained in WCCB's custody for a period greater than 18 months. Nevertheless, Mother contends that the trial court erred it determined that adoption would be appropriate for M.E.P.'s "needs and welfare" without considering whether a "bond" existed between herself and M.E.P. and found, as a result of Mother's limited intellectual capacity, that she failed to perform parental duties and would be unable to learn parenting skills in the foreseeable future. In support of her claims, Mother cites *In Re: P.A.B.*, 391 Pa.Super. 79, 570 A.2d 522 (1990), for the proposition that, for purposes of 23 Pa.C.S.A. § 2511(a)(5), consideration of the "needs and welfare of a child" must include an analysis of the parental bond, regardless of the parents' mental capacity.

¶ 23 In *P.A.B.*, mother and father (the parents), were the mentally impaired parents of three minor children. *P.A.B.*, 570 A.2d at 523. Although mentally impaired, the parents still undertook great effort to establish and nurture a bond between themselves and their minor children and strove to do their best to understand parental duties and how to perform them. *Id.*, 570 A.2d at 523. The existence of the parental bond was an undisputed fact of record. *Id.*, 570 A.2d at 522. Nevertheless, the parents required assistance in caring for their children, which was provided by various agencies. Eventually, Children and Youth Services (CYS) determined that the parents' efforts were insufficient, and the children were removed from custody and adjudicated dependent. *Id.*, 570 A.2d at 523. Several years after the children's removal and adjudication, CYS filed separate petitions to terminate the parents' rights in each of the children. *Id.*, 570 A.2d at 523.

¶ 24 After reaching the determination that "[t]he parents [were] of limited intelligence, limited parenting skills and limited ability to understand the obligations and duties of parenthood[,]" the trial court granted CYS's Petition. *Id.*, 570 A.2d at 523. Applying 23 Pa.C.S.A. § 2511(a)(5), the trial court found that the children were outside of the home for at least six months and that, because the parents were mentally impaired, the conditions leading to the removal would not change, regardless of assistance available. *Id.*, 570 A.2d at 524. Therefore, the trial court's opinion implied that those facts satisfied the relevant statutory requirements and required the conclusion that termination of parental rights would best serve the children's needs and welfare. *Id.*, 570 A.2d at 522.

¶ 25 The parents appealed the grant of the petition of Children and Youth Services (CYS) to terminate their parental rights in their minor children. *P.A.B.*, 570 A.2d at 522. On appeal, we found that the trial court erred in its application of 23 Pa.C.S.A. § 2511(a)(5). Our analysis of the statute led this Court to the conclusion that the phrase "needs and welfare" present in the statute contains an intangible dimension, *i.e.*, parental love. *Id.*, 570 A.2d at 525. As such, the unique bond of parental love makes preservation of family ties *prima facie* in the child's best interest. *Id.*, 570 A.2d at 525. However, we also found that in cases were no family bond exists and preservation of family unity *in form* would cast the child into an unhappy environment, a consideration of the child's needs and welfare may warrant termination. *Id.*, 570 A.2d at 525.

¶ 26 After applying the aforementioned principles to our analysis of the trial court's ruling, we reversed, holding:

A determination that the [p]arents' incapacity results in an inability to care for the children and that the condition cannot improve over time is alone insufficient to warrant termination under 2511(a)(5). In considering how termination affects the children's needs and welfare, a court must consider the role of the parental bond in the children's lives. Here, significantly, the court acknowledged but did not consider the children's relationship with the [p]arents.

*P.A.B.*, 570 A.2d at 528.

■ ¶ 27 The present case is distinguished from *P.A.B.* on its facts. The record contained ample evidence for the trial court to conclude that, although Mother loved M.E.P., no parent-child bond existed between them. As stated previously, Ms. Reagan's report of May 15, 2002, indicated that Mother expressed little interest in interacting with M.E.P., other than changing his clothes and bottle-feeding. *See* WHO Report, 5/15/2002. Further, Ms. Reagan's testimony demonstrated M.E.P. had not bonded with Mother and that M.E.P.'s recognition of Mother was no different than any other person that was a regular figure in his life at that point. N.T. Trial, 6/17/2002, at 25.

¶ 28 Traci Zimmerman, Mother's former WCCB caseworker, corroborated Ms. Reagan's testimony regarding the absence of a parent-child bond between Mother and M.E.P. *See* N.T. Trial, 6/17/2002, at 38–39. Ms. Zimmerman also testified that Mother undertook very little effort to move out of her parents' home and obtain counseling in accordance with her Family Service Plan. Ms. Zimmerman testified that Mother's parents' home was in a very poor, unsanitary condition that, in fact, was a dangerous environment for a young child. *Id.* at 33–34. Ms. Reagan and another WHO worker, Calvin Parker, made several attempts to arrange meetings with various charitable organizations to obtain an assisted living apartment for Mother, but Mother did not follow through with any of those meetings. *See id.*, at 44, 91–92. At the time of trial, Mother still resided with her parents. *Id.* at 40.

¶ 29 The trial court found the testimony of Ms. Reagan, Ms. Zimmerman and Mr. Parker credible, and we will not disturb those credibility findings on appeal. *See Smith*, 650 A.2d at 474. The testimony and other evidence produced at the termination hearing indicated that Mother exhibited love for her child but was unable to achieve any of the goals set for her to become an independent parent for M.E.P. and build a bond between herself and M.E.P. Indeed, Mother showed little interest in achieving those goals. During the visits with M.E.P., Mother displayed, at best, a passive interest in M.E.P.'s development and growth. Consequently, we conclude that the trial court had sufficient credible evidence before it to determine that there was no parent-child bond between Mother and M.E.P., and we are satisfied that it concluded correctly that such a bond did not exist and would not grow in the future. Therefore, we find that the trial court did not err when it determined pursuant to 23 Pa.C.S.A. § 2511(a)(5) and § 2511(b) that the conditions that led to M.E.P.'s placement would not abate, and, thus, termination was proper.

¶ 30 We consider Mother's third and fourth issues jointly. Mother's third and fourth claims challenge the applicability of 23 Pa.C.S.A. § 2511(a)(8). In order to terminate parental rights pursuant to 23 Pa. C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist;

and (3) termination of parental rights would best serve the needs and welfare of the child.

¶ 31 Mother contends that WCCB did not prove by clear and convincing evidence that termination would be in the best interests of the child because she was willing to remedy the conditions that led to M.E.P.'s removal, and she would remedy those conditions if given more time and assistance by the various social service agencies involved in the case. Mother's claims are without arguable merit.

¶ 32 The facts of this case are similar to those presented recently to this Court in *In Re: J.T. and R.T.*, 817 A.2d 505 (Pa.Super.2003). In *J.T. and R.T.*, Somerset County CYS removed J.T. and R.T. from their mother's apartment in September 1999, due to unsanitary conditions, lack of parental supervision and safety issues in the home. *Id.*, 817 A.2d at 507. After three permanency review hearings, it was determined that the conditions leading to the children's removal had not improved, and the goal was changed from reunification with the mother to permanent adoption. *Id.*, 817 A.2d at 507. Thereafter, Somerset County CYS filed a Petition to Terminate the parental rights of the mother, which the trial court granted.

¶ 33 The mother appealed to this Court. Mother claimed on appeal that the unsanitary conditions in which the children lived had been remedied, and, therefore, termination under 23 Pa.C.S.A. § 2511(a)(8) was improper. *J.T. and R.T.*, 817 A.2d at 506. On review, we affirmed the termination of the mother's parental rights. We found that, although the mother was willing to remedy the conditions that led to her children's placement, the mother was not able to demonstrate an ability to provide the basic need of a structured environment for the children, and, as such, termination un-der 23 Pa.C.S.A. § 2511(a)(8) was proper. *Id.*, 817 A.2d at 509.

¶ 34 We held that:

The trial court correctly noted that termination under subsection (a)(8) does not require evaluating Mother's willingness or ability to remedy the conditions that initially caused placement, nor does it require an evaluation of the availability or efficacy of CYS services. *Cf.* 23 Pa.C.S.A. § 2511(a)(5); *see In re A.L.D.*, 2002 PA Super 104, 797 A.2d 326 (Pa.Super.2002) (if parent appears incapable of benefiting from reasonable efforts supplied over realistic period of time, county Children and Youth Services has fulfilled its mandate and upon proof of satisfaction of reasonable good faith effort, termination petition may be granted). Though the state is required to make *reasonable efforts* to promote family stability and preserve family unity, *In Interest of Feidler*, 392 Pa.Super. 524, 573 A.2d 587, 588 (Pa.Super.1990); *In the Interest of S.A.D.*, 382 Pa.Super. 166, 555 A.2d 123, 124–25 (Pa.Super.1989), we cannot require CYS to extend services beyond what our legislature has deemed a reasonable time after state intervention or require Herculean efforts by CYS or other agencies after the goal has changed to adoption. Nor, in the interests of the children, should we. The state's interest in preserving family unity must be weighed along with the state's interest in protecting children, *see In re Adoption of A.N.D.*, 360 Pa.Super. 157, 520 A.2d 31 (Pa.Super.1986), and a child's right to a healthy and stable environment. A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting. *See Adoption of McCray*, 460 Pa. 210, 331 A.2d 652 (1975); *In re D.J.S.*, 1999 PA Super 214, 737 A.2d 283 (Pa.Super.1999). *See also In Interest of Lilley*,

719 A.2d 327 (Pa.Super.1998) (parent's basic constitutional right to custody and rearing of his or her child is converted, upon parent's failure to fulfill parental duties, to child's right to have proper parenting and fulfillment of his or her potential in permanent, healthy, safe environment).

*J.T. and R.T.*, 817 A.2d at 509–10.

■ ¶ 35 In the present case, there is no dispute that WCCB held M.E.P. in custody for greater than 12 months. Further, the evidence is clear that Mother continues to reside in a living environment dangerous to a minor child despite her stated intention to move into her own apartment. It is also clear from the testimony from the WCCB caseworkers that Mother is unable to learn simple parenting skills. Most importantly, Ms. Patterson's testimony established that Mother is mentally incapable of learning those skills or caring for a child's needs independently. These conditions have existed since the date of M.E.P.'s birth on December 24, 2000. Further, M.E.P. has lived in with foster parents who, since birth, provided M.E.P. with a structured and stable living environment. M.E.P.'s foster parents intend to adopt M.E.P. (at the conclusion of these proceedings) if Mother's parental rights are terminated.

¶ 36 Consequently, we find that the trial court did not err when it determined that the conditions leading to M.E.P.'s removal would not abate and that termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5) and (8) and 2511(b) was in M.E.P.'s best interests. As in *J.T. and R.T.*, we decline to put M.E.P.'s life on hold until the unlikely event that Mother summons the ability to handle the responsibilities of parenting. *J.T. and R.T.*, 817 A.2d at 509. Accordingly, we dismiss Mother's remaining claims.

¶ 37 As we have addressed each of Mother's claims and found them without merit, we affirm the order of the trial court.

¶ 38 Order affirmed.