J-A28011-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.C.J., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.D.-N., MOTHER | : : : : : : | |
| | : | No. 1249 EDA 2019 |

Appeal from the Decree Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000328-2018

BEFORE:   PANELLA, P.J., STABILE, J., and STEVENS, P.J.E.*

MEMORANDUM BY PANELLA, P.J.:           **FILED FEBRUARY 04, 2020**

A.D.-N. ("Mother") appeals from the decree entered March 25, 2019, that granted the petition of the Philadelphia Department of Human Services ("DHS"), and involuntarily terminated her parental rights to her daughter, C.C.J. (born September 2014) ("Child" or "the Child").[1]  After careful review, we affirm.

The trial court set forth the procedural and factual history of this matter as follows:

> Child is approximately four and [a] half years old and has been in a kinship home with maternal cousin through Second

---

* Former Justice specially assigned to the Superior Court.

[1] The trial court also involuntarily terminated the parental rights of any unknown father of Child.  Further, the trial court confirmed the consent of Child's father, J.J. ("Father"), to the termination of his parental rights.  Neither Father nor any unknown father has appealed the termination of their parental rights, nor have they participated in this appeal.

Chance foster home for a little over three years. [DHS] first became aware of the Child in November 2015 when the Child was admitted to the hospital for second [degree] burns on her face and arm. Mother did not seek medical attention for the Child until the burns had started to blister and drain. Other concerns included Mother's "unstable housing, lack of employment, and mental health issues." Ultimately, the report was determined to be valid and as a result, the Child was removed from Mother's home. At a shelter care hearing held for the Child on November 6, 2015, the Honorable Glynnis Hill granted temporary legal custody of the Child to DHS. On December 10, 2015, the Child was adjudicated dependent and committed to DHS based on present inability of [the] parents to provide "proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals."

On April 20, 2018, DHS filed petitions to involuntarily terminate Mother's parental rights to the Child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) and to change the Child's permanency goal to adoption. This [c]ourt conducted a combined termination and goal change hearing (collectively the "TPR" hearings) on March 25, 2019.

Trial Court Opinion, 8/1/19, at 1-2 (citations to the record omitted).

At the hearing on the petitions, DHS presented the testimony of Deija Clayton, the Community Umbrella Agency ("CUA") case manager.[2] Mother testified on her own behalf. On March 25, 2019, the trial court entered the decree involuntarily terminating Mother's parental rights to Child pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b). Mother timely filed a notice of appeal and concise statement of errors complained of on appeal.

On appeal, Mother raises the following issues for our review.

---

[2] At the hearing, Child was represented by a Child Advocate, Lisa Visco, Esquire, and a guardian *ad litem*, Jo Ann Braverman, Esquire.

- 2 -

1. Did the trial court commit reversible error, when it involuntarily terminated Mother's parental rights where such determination was not supported by clear and convincing evidence under the [A]doption [A]ct, 23 P[a].C.S.A. § 2511(a)(1), (2), (5), and (8)?

2. Did the trial court commit reversible error, when it involuntarily terminated Mother's parental rights without giving primary consideration to the effect that the termination would have [] on the developmental, physical and emotional needs of the child as required by the [A]doption [A]ct, 23 P[a].C.S.A. § 2511(b)?

3. Did the trial court commit reversible error, in failing to admit [M]other's exhibits demonstrating [M]other's compliance with her family service plan goals?

4. Did the trial court commit reversible error where [M]other complains of ineffective assistance of counsel?

Mother's Brief at 4.

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. § 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (8), as well as (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we will focus our analysis on Section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

- 4 -

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under Section 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

*In re Adoption of S.P.*, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

To satisfy the requirements of Section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements:

- 5 -

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under Section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. *See In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id.* A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id.* at 340.

Mother argues as follows with respect to Section 2511(a)(2):

Mother has worked to meet the goals required of her. Mother has obtained housing. Mother has also acquired stable employment and has been consistently visiting with the child. Mother was engaged in mental health therapy. Mother took these steps in an attempt to parent and to eventually reunite with her child. Her ability to obtain housing and obtain stable employment clearly indicate that Mother has the current capability and wil[ling]ness to parent [Child] and that the circumstances that brought [Child] into care have been rectified.

Mother's Brief at 14.

In terminating Mother's parental rights pursuant to Section 2511(a)(2), the trial court reasoned:

Applying [**In re Adoption of M.E.P.**, 825 A.2d 1266 (Pa. Super. 2003)] and the elements set forth under [Section] 2511(a)(2) to the instant case, it is clear that [DHS] met [its] burden of demonstrating that termination was proper. The evidence established that "incapacity" and "refusal" under [Section] 2511(a)(2) existed given that Mother failed to demonstrate a concrete desire or ability to care for the Child. Mother failed to cooperate with CUA throughout the life of the case, including attending drug and alcohol and mental health treatment, obtaining CUA approved housing, and visiting regularly with Child. Mother was referred to drug and alcohol treatment when she gave birth in March 2018 to a child who tested positive for marijuana. Mother has not provided consistent drug screens showing sobriety nor offered proof that she successfully completed a drug treatment program prior to the petition being filed. Additionally, testimony demonstrated that "consistent" mental health treatment would be essential for Mother before any unsupervised contact could begin and prior to reunification with the Child, but no documentation of consistency has been offered.

Moreover, Mother did not have a reliable influence or role in the Child's life as she has resided in Florida since May 2018 even though her Child resides in Philadelphia. Although Mother would occasionally bring clothes and shoes for Child on visits, the evidence established that "neglect" existed given that Mother had only visited the Child five times since March 2018. This [c]ourt found that Mother's failure to comply with CUA and consistently visit the Child has left the Child without essential parental care, and the cause of such neglect, refusal and continued incapacity will not be remedied by Mother. Based on the foregoing reasons, this [c]ourt found that competent evidence existed to justify the termination of Mother's parental rights pursuant to Section 2511(a)(2).

Trial Court Opinion, 8/1/19, at 11-12.

The record supports the trial court's conclusion. Clayton testified that DHS involvement with the family began when Child sustained second degree

burns to her face and arm and Mother delayed seeking medical attention. ***See*** N.T., 3/25/19, at 9-10. Other concerns included Mother's unstable housing, lack of employment, and mental health issues. ***See id.***

Accordingly, Child was adjudicated dependent and a single case plan was implemented. ***See id.*** Mother's objectives included obtaining employment and housing, completing a parenting class, and following the recommendations of her mental health evaluation. ***See id.*** at 10-11. Later, objectives were added for Mother to complete Job Corps training and address her substance abuse issues. ***See id.*** at 11, 16.

Mother's mental health diagnoses included anxiety, depression, and post-traumatic stress disorder. ***See id.*** at 13. However, Mother did not consistently attend mental health treatment. ***See id.*** at 12. Moreover, Mother failed to maintain consistent and stable housing. ***See id.*** at 13.

Mother attended a Job Corps program in June 2016, but, by August 2017, Mother was residing in a homeless shelter in Michigan. ***See id.*** at 14, 24. Mother returned to Philadelphia, living in a home with "general sanitation issues." ***See id.*** Mother then lived with her mother, before moving to Florida. ***See id.*** at 14-15. Clayton testified that Mother moved to Florida because Mother claimed that she had more support to meet her objectives. ***See id.*** at 24.

While Mother completed a parenting program, she was re-referred because, in March 2018, Mother gave birth to a child who tested positive for marijuana. *See id.* at 16.

Clayton acknowledged that Mother completed a parenting study in Florida. *See id.* at 25. However, as of the date of the termination hearing, Mother had not successfully completed substance abuse treatment, and failed to provide consistent drug screens demonstrating sobriety. *See id.* at 16-17.

With respect to Mother's visits with Child, Clayton testified that the visits were always supervised. *See id.* at 17, 22. From December 2016, through September 2017, Mother did not visit Child at all. *See id.* While Mother then attended visits, she visited Child five times after March 2018. *See id.* at 17-18. Child would cry at the end of visits and cry for "Mommy" when she was in trouble. *See id.* Clayton testified that, over all, the visits were appropriate and Mother brought clothes for Child. *See id.* at 33-34.

Mother testified that, before she left Philadelphia to attend a Job Corps program in November 2015, she lived with Child in Child's foster home. *See id.* at 38-39. She enrolled in Job Corps training in Michigan because she located a shelter there. *See id.* at 40. Mother acknowledged she left the Job Corps program in June or July 2017. *See id.*

During Mother's time at Job Corps, she did not see Child, asserting that the program was a "closed campus," and that CUA did not assist with transportation. *See id.* at 58-61. Thereafter, Mother returned to Philadelphia

in September 2017 before moving to Florida in May 2018. *See id.* at 41-43. Mother testified that, while in Philadelphia, she found employment and attended mental health treatment. *See id.* at 41-44.

Mother further testified that she continued to attend mental health treatment in Florida, attending therapy every other week. *See id.* at 47-49. Nevertheless, Mother conceded that she occasionally experienced mental health issues that were debilitating and significantly impaired her function. *See id.* at 57. Additionally, Mother acknowledged that she is supposed to attend therapy every week, but only attends bi-weekly, attending 7 out of 16 therapy sessions. *See id.* at 62-63. Mother further testified that she obtained stable and appropriate housing in Florida and completed parenting courses. *See id.* at 46-53.

With respect to substance abuse, Mother testified that she tested positive for "one drug" following the birth of Child's sibling in March 2018. *See id.* at 58. However, Mother asserted that she was never told to participate in substance abuse treatment. *See id.* at 55. Mother further testified that while she was required to attend random drug tests, no one had ever contacted her to appear for a drug test. *See id.* Mother believed that she had made progress and requested that Child be returned to her in Florida. *See id.* at 56.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting

responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Here, the trial court credited the testimony of DHS's witness, and the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *See In re B.L.W.*, 843 A.2d at 384.

We next consider whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(b). The requisite analysis is as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis,

it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Mother argues that she and Child share a beneficial bond that should not be destroyed through the termination of her parental rights. *See* Mother's Brief at 18. Mother contends that her visits with Child go well, and that Child cries at the end of the visits. *See id.* at 19. Further, Mother argues that no testimony established that there would not be irreparable harm if her parental rights were terminated. *See id.* Accordingly, Mother concludes that her parental rights should not have been terminated. *See id.*

The trial court found that termination of Mother's parental rights was in the best interests of Child pursuant to Section 2511(b), reasoning:

> In the instant matter, this [c]ourt determined that the Child would not suffer irreparable emotional harm if Mother's parental rights were terminated. Mother offered as evidence establishing the existence of a parent-child bond that Child calls her "mommy." However, Mother admitted that Child also calls her maternal cousin, who Child has lived with eighty-five percent of her life, "mommy." The testimony further demonstrated that the Child's

primary bond is with her maternal cousin and that the maternal cousin gives the Child comfort, support, safety, stability, and meets all of her needs. Additionally, in determining that termination would best serve the needs and welfare of the Child, this [c]ourt considered that Mother had not been able to meet the Child's emotional, physical, and developmental needs, or provide the Child[] with a healthy, safe environment for almost three and a half years prior to the TPR hearing. This [c]ourt also took into consideration the wishes of the child. The CUA worker, Ms. Clayton, testified that to her understanding, she believed that the Child would like to remain permanently where she is currently since the Child is "very close" to her family and siblings. For the foregoing reasons, this [c]ourt properly granted DHS's petition to involuntarily terminate Mother's parental rights pursuant to Section 2511(b).

Trial Court Opinion, 8/1/19, at 14-15 (citations to the record omitted).

The record supports the trial court's conclusion. Clayton testified that Child has lived with her foster mother for more than three years. *See id.* at 18-19. Clayton noted that Child refers to her foster mother as "mommy." *See id.* Further, Clayton observed a parent/child bond between Child and her foster mother, and Child looks to the foster mother for her comfort and support. *See id.* at 19. Moreover, the foster home provides Child safety, stability, and support, and is a pre-adoptive placement. *See id.* at 19-20. Clayton opined that there would be no irreparable harm to change Child's permanency goal to adoption, and that establishing permanency for Child is in Child's best interests.[3] *See id.* at 20-21.

_____

[3] The Child Advocate noted that she visited Child, and that Child expressed she wants to stay in the foster home and be adopted. *See* N.T., 3/25/19, at 37.

Mother testified that her visits with Child go well. ***See id.*** at 55-56. Mother asserted that Child cries when the visit is over and tells Mother that she wants to go home with Mother. ***See id.*** at 56. Mother's visits occurred once per month, and Mother acknowledged that Child refers to both Mother and her foster mother as "mommy." ***See id.***

The credited testimony supports the trial court's conclusion that it would best serve the needs and welfare of Child to terminate Mother's parental rights pursuant to Section 2511(b). Preserving Mother's parental rights would serve only to deny Child the permanence and stability to which she is entitled. ***See In re Adoption of C.D.R.***, 111 A.3d at 1220 ("Clearly, it would not be in [the child's] best interest for his life to remain on hold indefinitely in hopes that Mother will one day be able to act as his parent"). Accordingly, the trial court did not err in terminating Mother's parental rights to Child pursuant to Section 2511(b).

In Mother's third issue, she asserts that the trial court improperly excluded documentary evidence establishing Mother's compliance with her objectives. ***See*** Mother's Brief at 19-21. The documents in question relate to Mother's completion of parenting classes in Florida, as well as mental health therapy Mother received in Florida. ***See id.*** at 19-20. Although Mother does not explain why the trial court erred in excluding these documents, she asserts that courts often admit such documents and "'give them the weight' they merit." ***See id.*** at 19-21.

With respect to the trial court's rulings on the admissibility of evidence, this Court has stated:

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party.
>
> An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

**Phillips v. Lock**, 86 A.3d 906, 920 (Pa. Super. 2014) (citation omitted).

> An error will be deemed harmless if:
>
> (1) the error did not prejudice the defendant or the prejudice was *de minimus*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence . . . was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Markman**, 916 A.2d 586, 603 (Pa. 2007). **See also**

**Schuenemann v. Dreemz, LLC,** 34 A.3d 94, 99 (Pa. Super. 2011) ("[Evidentiary] rulings must be shown to have been not only erroneous but also harmful to the complaining part[y]."), *appeal denied*, 740 A.2d 233 (Pa. 1999).

Here, Mother's testimony suggests that the documents in question are records to establish that Mother completed parenting classes, and a letter

- 15 -

demonstrating Mother attended Florida State University Center for Couple and Family Counseling to treat for mental health issues. ***See*** N.T., 3/25/19, at 47-54. Mother attempted to admit the documents. However, the trial court sustained hearsay objections and refused to permit Mother to admit the documents into evidence. ***See id.***

Hearsay is "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). "Hearsay is not admissible except as provided by [the Pennsylvania Rules of Evidence], by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

While Mother argues that similar documents are often admitted to be given the weight they merit, she offers no appropriate evidentiary basis upon which the documents could be admitted. Here, it is apparent that the documents were being introduced by Mother to establish the truth of the matter asserted, namely, that she had completed parenting classes and attended mental health therapy. Accordingly, the documents constituted inadmissible hearsay and the trial court did not err in excluding the documents.

Nevertheless, even if we assume the trial court erred in excluding the documents, the error is harmless. The trial court gave Mother significant

leeway to testify regarding her completion of parenting classes and her participation in mental health therapy.

Mother testified that she attended the Florida State University Center for Couple and Family Counseling to address "past trauma due to being in care from the age of one to eighteen that I experienced." *See* N.T., 8/1/19, at 48-49. Mother testified that she also engaged in domestic violence counseling. *See id.* at 49.

However, Mother acknowledged that she experienced mental health issues that are sometimes debilitating and significantly impair her function. *See id.* at 57. Further, Mother testified that she attends therapy once every two weeks instead of once every week, and that she attended only 7 out of 16 sessions of therapy. *See id.* at 62-63. Mother also testified that she completed parenting classes in Florida. *See id.* at 50-53.

The trial court permitted Mother wide latitude to testify regarding the facts contained in the excluded documents, and Mother did so. Mother points to no facts contained in the documents that she was unable to establish through her own testimony at the hearing. Accordingly, any error is harmless.

For similar reasons, we reject Mother's assertion that her trial counsel was ineffective for failing to better prepare for the termination hearing and subpoena witnesses so that the documents in question could be properly admitted. *See* Mother's Brief at 21-23.

With respect to the standard governing the representation of counsel in a matter involving the termination of parental rights, this Court has stated:

> The unique nature of parental termination cases has long been recognized by the Supreme Court of Pennsylvania. Thus, *In re Adoption of R.I.*, 455 Pa. 29, 312 A.2d 601 (1973), the Supreme Court held that an indigent parent in a termination of parental rights case has a constitutional right to counsel. The right to counsel in parental termination cases is the right to effective assistance of counsel even though the case is civil in nature. *In re Adoption of T.M.F.*, 392 Pa.Super. 598, 573 A.2d 1035 (1990) (*en banc*); *see also*, *In the Interest of S.W.*, 781 A.2d 1247 (Pa.Super. 2001). However, this right is more limited than that in criminal cases, as claims of ineffective assistance of counsel must be raised on direct appeal. We then review the record as a whole to determine whether or not the parties received a "fundamentally fair" hearing; a finding that counsel was ineffective is made only if the parent demonstrates that counsel's ineffectiveness was "the cause of the decree of termination."

*In re J.T.*, 983 A.2d 771, 774–75 (Pa. Super. 2009) (some citations omitted).

Mother's argument that her counsel was ineffective lacks merit. The record confirms that the cause of the termination decree was not counsel's purported ineffectiveness in failing to enter documentation establishing that Mother completed parenting classes and attended less than half of her mental health treatment sessions in Florida. Mother testified to these facts and the trial court considered Mother's testimony. *See* Trial Court Opinion, 8/1/19, at 4, 16, 19. However, the trial court concluded that Mother's actions over the course of years established that Mother "routinely demonstrated inconsistency and an inability to properly care and meet the needs of the Child," and that the documents in question would not have changed the outcome. *See id.* at 17, 19. Accordingly, Mother is unable to establish that counsel's purported

ineffectiveness caused the court to involuntarily terminate her parental rights, and Mother's final issue does not merit relief.

For the foregoing reasons, we conclude that the trial court appropriately terminated Mother's parental rights pursuant to Section 2511(a)(2) and (b).

Decree Affirmed.
Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/4/20