573 A.2d 587

**In the Interest of James FEIDLER, Robert Feidler and Christopher Feidler.**

**Appeal of Robert FEIDLER and Christopher Feidler and Carl Feidler, Sr. and Patricia Feidler, His Wife, Appellants,**

**Clinton County Children and Youth Services.**

Superior Court of Pennsylvania.

Argued Jan. 19, 1990.

Filed April 17, 1990.

Stephen C. Smith, Lock Haven, for appellants.

Lewis G. Steinberg, Lock Haven, for Children and Youth Services, participating party.

Before ROWLEY, WIEAND and FORD ELLIOTT, JJ.

FORD ELLIOTT, Judge:

This is an appeal from an order removing minor children from the home of their natural parents and placing them in the legal and physical custody of Clinton County Children and Youth Social Services Agency. Both the minors, Robert, now age 17, and Christopher, now age 12, as well as the natural parents, Patricia and Carl Feidler, have appealed. The child advocate has filed a brief on behalf of the minors in which the parents join. Upon our review of the record, the briefs and the applicable law, we find that the trial court abused its discretion in ordering removal and therefore, reverse.

On May 1, 1987, a petition was filed against Robert and Christopher along with another brother to consider a finding of dependency. The substantive allegation in the petition was one of truancy. On June 23, 1987, following a Stipulation and Agreement, Robert and Christopher were adjudicated as dependent with legal and physical custody to remain with their parents subject to supervision by the

Clinton County Children and Youth Social Services Agency. On May 17, 1989, a letter was filed on behalf of the Clinton County Children and Youth Social Services Agency requesting a disposition hearing because of a lack of parental supervision of the minor children and a transfer of legal and physical custody of them to the agency for initiation into the foster care program. On June 6, 1989, a disposition hearing was held and the court ordered legal and physical custody to remain with the parents subject to drug and alcohol evaluations and treatment for the family, cooperation with the C.A.S.S.P. program, a possible referral to the Family Therapy Center for intensive treatment, and curfews for the minor children.

On July 26, 1989, on request of the agency, a hearing was held to determine whether there had been violations of the trial court's order. On July 27, 1989, the trial court transferred legal and physical custody of the children to the Clinton County Children and Youth Social Services Agency, effective August 1, 1989, for foster home placement for Christopher, and a forty-five day evaluation at the Children's Home of York for Robert. Appellants filed an Application for Stay on July 28, 1989, but were denied relief. On appeal, appellants argue that Robert and Christopher's removal from the home of their parents was not clearly necessitated on this record.

A fundamental purpose of the Juvenile Act is "to preserve the unity of the family whenever possible and to provide for the care, protection, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1). "The legislature has placed primacy on the right of parents to raise their own children and the desirability of children to be raised by their natural parents." *In Interest of S.A.D.*, 382 Pa.Super. 166, 175, 555 A.2d 123, 128 (1989). Even if a child is adjudicated dependent under the Juvenile Act, he cannot be separated from his parents absent a showing that the separation is clearly necessary. *In Interest of S.A.D., supra.* A "clear necessity is established when the court

determines that alternatives to separation are unfeasible." *In Interest of S.A.D., supra,* 382 Pa.Super. at 172, 555 A.2d 126, citing *In the Interest of Ryan, Michael C.,* 294 Pa.Super. 417, 440 A.2d 535 (1982). Moreover, it is axiomatic that the Children and Youth Social Services Agency must make reasonable efforts to prevent the unnecessary placement of children in foster homes. *Id.* "A judicial determination of those efforts serves to closely examine, in the case of each individual child, whether reasonable efforts were made to keep the family intact." *In Interest of S.A.D., supra,* 382 Pa.Super. at 174, 555 A.2d at 127. The agency must not only provide preventive and reunification services to families in need, but can be required also to provide services that are generally the province of other agencies. *Id.; see Making Reasonable Efforts: Steps for Keeping Families Together,* published by the National Council of Juvenile and Family Court Judges, the Child Welfare League of America, the Youth Law Center and the National Center for Youth Law (no publication date).

Presently, the trial court found that the testimony of July 26, 1989, provided clear and convincing evidence that appellants had violated the previous court order, and that a directive to the agency to provide further services would be of no avail. Upon our careful review of the record, we believe that the evidence was not so clear and convincing and that the trial court abused its discretion in finding that it was clearly necessary for Robert and Christopher to be removed from their natural parents.

Initially, we note that this court is presented with a woefully inadequate record upon which to justify removal of children from their family home. The determination of dependency occurred in 1987, on Stipulation and Agreement of the parties as a result of a truancy problem. However, a review of the transcript from that hearing indicates that the mother, the only parent present, thought that the attorney for Children and Youth Services was her attorney as well. Additionally, there is nothing in the record to indicate what prompted the subsequent agency request for the disposition

hearing in June, 1989. The only reference contained in the May 4th letter requesting the hearing is that "In the opinion of the Agency, the Juveniles do not have the appropriate parental supervision." At the subsequent June hearing the agency put no evidence on the record as to what lack of supervision prompted its May 4th letter, but rather advocated that the children remain with the parents subject to conditions imposed by the court.

The June 6, 1989 order provided the following conditions:

1. That the family, including the parents and children, participate in drug and alcohol abuse evaluation and treatment at the Greenridge Center.

2. That the family cooperate with the C.A.S.S.P. program and any possible referral to the Family Therapies Center for Intensive Treatment Program.

3. That Christopher be subject to a 9:00 p.m. curfew and Robert be subject to a 10:00 p.m. curfew.

4. That Christopher and Robert be prohibited from associating with Melisssa Young or going to her residence which is currently 104 Commerce Street, Lock Haven, Pennsylvania.

On July 26, 1989, the minor children were removed from their parents because of alleged violations of these conditions.

■ As to the first condition, the trial court found that the parents were in violation for failing to attend two scheduled meetings with an agency psychologist, Pam McCloskey. However, the order of court provided for the family to be evaluated and treated for drug and alcohol abuse at the Greenridge Center.[1] It is the agency that set forth the prerequisite that the parents must meet with Ms. McCloskey. As testified to by Mr. Farley, an agency caseworker, the agency employed Ms. McCloskey as its own psychologist subsequent to the June 6th court hearing and then requested the Feidlers to submit to an evaluation by

1. We again note at this juncture, that there is no evidence of record to disclose to this court which family members had an alcohol or drug problem as well as the nature of the problem.

her prior to the evaluation and treatment at Greenridge Center. While the agency may deem this preliminary examination by its own person as relevant, a failure on the part of the Feidlers to submit to it can hardly be characterized as a violation of the court's first condition as such a meeting was not contemplated at the time the conditions were set.

However, even if we were to find that the initial evaluation by Ms. McCloskey was necessary, we do not find any evidence of record to establish that the failure of the parents to make the scheduled appointment was intentional in order to thwart treatment. It is evident from the record that the failure to attend the first appointment on June 21, 1989, was excused. Mrs. Feidler had cancelled the appointment because she was ill and the appointment was rescheduled for June 29th. It is interesting that according to the testimony of Mr. Farley, even if the Feidlers had attended the June 21 appointment, they would have found the agency closed that afternoon. There is no evidence on the record which discloses why the June 29 appointment was missed. However, we disagree with the trial court that that incident alone represented a violation of the court's first condition.

As to the second condition, the family was required to participate in a new C.A.S.S.P. Family Therapy Program. The program was designed to gather various service providers from the community in order to help the family in addressing its needs. The Feidlers attended the first meeting on June 19, 1989, but when Mr. Feidler learned that Kim Crossen, Robert's probation officer, was attending the meeting he would not participate. The meeting was held anyway with Mrs. Feidler and the two boys in attendance. The record reflects that the agency knew of Mr. Feidler's conflict with Kim Crossen, but determined that she be part of the C.A.S.S.P. team because she was Robert's probation officer and was the only probation officer in the county. Thereafter, on June 23, 1989, another meeting was scheduled without Ms. Crossen in attendance. The purpose of this meeting was again to explain the program to the

Feidlers. Apparently, a component of the Family-based program was to have support personnel go into the Feidler's home. However, this court cannot determine from this record what support the personnel were to provide within the home. This is also the question which concerned Mr. Feidler, both at the June 6th and the July 26th hearings. During the June 6th hearing, the court indicated to Mr. Feidler that he could have his concerns addressed by the court after the program was explained to him. Following the June 23rd meeting with the C.A.S.S.P. person, the referral to that program was dropped by the agency because Mr. Feidler refused to allow anyone to come into his home. The court thereafter determined at the July 26th removal hearing that this refusal evidenced Mr. Feidler's "hostility toward any intervention with respect to his family." Trial court opinion, 6/27/89 at 4. This court cannot agree with this finding based on the record before us. With the exception of the June 29th appointment scheduled with Pam McCloskey, the Feidlers attended all meetings scheduled by the agency. Mr. Feidler showed up for the first C.A.S.S.P. meeting but refused to participate because Kim Crossen was present. It is apparent from the testimony of Mr. Farley, that the agency was fully aware of the personal conflict between the two prior to scheduling this meeting. As to the second meeting which caused the agency to drop the C.A.S.S.P. referral, Mr. Farley testified that the purpose of the meeting was to explain the program to Mr. Feidler. However, Mr. Farley did not attend this meeting and therefore could not answer as to whether Mr. Feidler understood the program as explained. Without more, we cannot agree with the trial court that the second condition was violated and that Mr. Feidler was thwarting any intervention with his family. Mr. Feidler testified that he would be willing to meet with the program people outside his home and if he got to know them better, he might be willing to let them come into his home. As this court has nothing of record to indicate what the C.A.S.S.P. program was designed to do, we have no way of determining whether Mr. Feidler's refusal was unreasonable.

■ Thirdly, the order provided that Christopher be subject to a 9:00 p.m. curfew, and Robert a 10:00 p.m. curfew. The record clearly reflects, and the trial court agrees, that Christopher did not break his 9:00 p.m. curfew. However, the trial court found Robert to have broken his curfew twice. Without more, Robert's violating his 10:00 p.m. curfew twice does not clearly necessitate his removal from his parents' home, especially in light of the fact that he attended and participated in all appointments that the agency scheduled for him. Moreover, Christopher also attended all of his scheduled agency appointments.

■ Finally, the trial court found the children to have violated its fourth condition, that of associating with Melissa Young or frequenting her residence.[2] The record reveals that Christopher was spotted on Ms. Young's porch on one occasion and that Robert was spotted on the property twice. However, there was no direct testimony that either of the boys had contact with Melissa, nor if she was even home at these particular times. Although the order specifically stated that the minors were not permitted at her residence, we do not find that such infractions clearly necessitate the children's removal from their natural parents.

This court cannot affirm a separation of minor children from their natural parents unless there is clear and convincing evidence on the record that every reasonable effort has been made to keep the family together. Only after this standard has been met will removal be countenanced on the basis of clear necessity. *In Interest of S.A.D., supra.* Based on the limited record before this court, we cannot find that the agency has exercised all reasonable efforts to keep this family together. Although we recognize that the agency bears a heavy burden in removing children from their natural parents, we would not have it any other way since our legislature and this court have placed primacy on

2. The record reflects that Ms. Melissa Young is a young woman with a young child who has been referred to the agency. Also, her residence is *speculated* to be a teenage hangout for drug and alcohol activity. N.T., 7/26/89 at 20. (emphasis added)

the right of parents to raise their own children; thereby, keeping the family intact.

Further, we cannot find that the parents have intentionally thwarted all attempts at intervention. Admittedly, the Feidlers are not sophisticated or well educated people, and they may not even be the best of parents, however, it must be remembered always, that the Juvenile Act:

> was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take children of the illiterate and crude and give them to the educated and cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

*In Interest of S.A.D., supra*, 382 Pa.Super. at 176, 555 A.2d at 128 (citations omitted).

The order of the trial court is reversed and this case is remanded to the trial court with instructions that the children be returned to their natural parents with agency services to be provided to appellants consistent with this Opinion. The reinstatement of the parents with the children is always subject to further review by the trial court on an ongoing basis, due to Robert and Christopher's adjudication of dependency.

Reversed and Remanded.