J-S37031-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: A.S. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1628 EDA 2021 |

Appeal from the Order Entered August 9, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000224-2021

BEFORE:   PANELLA, P.J., MURRAY, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED JANUARY 28, 2022**

L.S. ("Paternal Grandmother" or "PGM") appeals from the order entered in the Court of Common Pleas in Philadelphia County adjudicating her grandson, A.S. ("Child"), dependent under the Juvenile Act on evidence that she violated a prior court order granting her sole legal and physical custody of Child when she elected to leave Child in the custody of his drug-addicted parents ("Father" and "Mother") for six months.

Herein, Paternal Grandmother contends the court erred in determining that Child met the Act's definition of a dependent child, that removal of Child from Paternal Grandmother's Philadelphia home where Father and Mother reside was clearly necessary, that DHS made reasonable efforts to prevent

_____

[*] Former Justice specially assigned to the Superior Court.

removal, and that placement with Paternal Grandmother in her new residence in New Jersey was dependent upon the approval of both DHS and New Jersey after implementation of governing procedures in the Interstate Compact for the Placement of Children ("ICPC").[1]  We affirm.

Child was born prematurely on December 17, 2019, while Mother was an in-patient resident in Libertae Halfway House, Bucks County, due to her addiction to heroin and other narcotics.  At the time, Father also used heroin and other drugs.  N.T., 8/9/21, at 26, 78-80.

Because Mother declined Bucks County Youth Agency's request that she relinquish Child to foster care, the Agency offered to stop its involvement in the case only if she and Father entered into a voluntary agreement to relinquish legal and physical custody to Paternal Grandmother, L.S., who resided in Philadelphia County.  N.T. at 80.  Mother and Father agreed, and Paternal Grandmother obtained legal and physical custody of Child pursuant to a custody order memorializing parents' stipulation that they "agree not to remove child from [Paternal Grandmother's] direct care until further Custody Agreement of Order of the Court is entered."  Order, 8/3/19.

---

[1] **See** 62 P.S. § 761.  The ICPC is an agreement among the states, the District of Columbia and the Virgin Islands to cooperate with each other in the interstate placement of children.  **See id.** at Article I ("(a) Each child requiring placement shall receive the maximum opportunity to be placed in a suitable environment and with persons or institutions having appropriate qualifications and facilities to provide a necessary and desirable degree and type of care.").

In June of 2020, shortly after Mother's discharge from Libertae, she and Father began residing at Paternal Grandmother's Philadelphia apartment. N.T. at 7/13/21, at 8-9. On July 30, 2020, Philadelphia DHS received a General Protective Services (GPS) report alleging that Mother had tested positive for methamphetamines on July 15, 2020 and had overdosed on either July 18 or July 19 of 2020. The report further noted Paternal Grandmother was aware of parents' drug use and had left Child alone with parents on multiple occasions while she went to work. Neighbors reported seeing parents occasionally driving with Child in the car, including once on July 27, 2020, when Mother appeared visibly intoxicated. N.T. at 9-13.

DHS Social Worker LaKreisha Walker-Richards investigated the GPS report by visiting Paternal Grandmother's apartment on July 30, 2020. Paternal Grandmother and Father refused her entry and displayed hostility toward her during their discussion outside the apartment. N.T. at 10-11. After police arrived at Ms. Walker-Richards' request and the family calmed down, Father admitted he used his drug of choice, heroin, as recently as two weeks earlier and claimed he was undergoing outpatient treatment for his substance abuse problem. He declined, however, to sign a release of records request form that would enable DHS to verify his enrollment. N.T. at 12.

Ms. Walker-Richards also observed Mother and believed her to be intoxicated, but Mother ran inside the home and refused to submit to an

interview. *Id*. Child was eventually brought out to Ms. Walker-Richards, who concluded that he appeared healthy and safe. N.T. at 11.

On August 10, 2020, Ms. Walker-Richards returned to Paternal Grandmother's apartment with the intention of interviewing family members and checking on Child's health and welfare. N.T. at 20. She reported the apartment's living conditions were appropriate in all respects and saw no domestic violence concerns with Child's Father. N.T. at 25.

During the interview of Mother, Mother dismissed her positive test for methamphetamines as a false positive caused by her weight and her metabolism of drugs used for her treatment. Ms. Walker-Richards confirmed with the treatment facility, however, that Mother had been removed from the program prior to her successful completion because of the methamphetamine test result. Mother also self-reported her use of Adderall and Suboxone, but she failed to provide prescriptions for these medications. N.T. at 21-22

Paternal Grandmother also spoke to Ms. Walker-Richards and denied ever seeing Father or Mother under the influence of drugs while with Child. She maintained that she never leaves home without bringing Child with her and dropping him off at her sister-in-law's home, as she believed Father and Mother remained active in their drug use. N.T. at 23-24.

On August 27, 2020, Ms. Walker-Richards made her third and final visit to Paternal Grandmother's residence, where she informed the family that it was DHS's conclusion that the GPS report was valid as to allegations of

parents' continued substance abuse but not as to allegations that Paternal Grandmother left Child alone with parents. Ms. Walker-Richards then discussed services available to the family, but each member declined the services. N.T. at 28, 30, 34-36.

On March 2, 2021, a second GPS Report was filed based on neighbors' allegations of frequent visitors to the apartment at all hours, recurrent crying by the Child, parents' drug use and drifting around the property, Father's driving with a suspended license, and the possibility that Paternal Grandmother had left Child to be raised by Mother and Father. N.T. at 43-45. Specifically, the allegation categories of the report were "conduct by parent/caretaker that placed the child at risk" and "substance abuse." N.T. at 43. DHS Social Worker, Zohrmella Savoy, investigated the report that same day. N.T. at 45-46.

Initially, after knocking repeatedly on the door to the apartment, Ms. Savoy was twice refused entry by Father over a five to ten minute period until she indicated she would call police, at which time Mother let her in. N.T. at 46. Once inside, Ms. Savoy encountered not only Mother, Father, and Child but also five visitors who appeared to be either busily cleaning up the cluttered apartment or too intoxicated to help. N.T. 7/13/21 at 46-48. Two visitors claimed to be a cleaning service, although Mother later said they met at rehab, and another individual and his girlfriend emerged from the back bedroom. N.T. at 46-47. One person in the bathroom was in "pretty bad shape", as he

could not stand up or hold his head up, and his speech was very slurred. N.T. at 47. Ms. Savoy detected "a very strong aroma" of marijuana in the home. N.T. at 49.

Ms. Savoy's conversation with Father led her to believe he, too, was under the influence. N.T. at 48-49. Father admitted to using Marijuana, Xanax, and "benzos" (benzodiazepine) recently and said he would test positive if tested. Ms. Savoy claimed that despite his obvious impairment, Father appeared to be "in the best shape" out of the seven adults present in the apartment.

It was Ms. Savoy's impression that Mother had emerged from the bedroom to answer the door earlier, as Child was asleep in a pack-n-play and Mother appeared tired. N.T. at 56. According to Ms. Savoy, Mother continually nodded off during the daytime interview, but she denied opioid use and attributed her state, instead, to her usage of what she claimed was prescribed Adderall. N.T. at 50-51. Ms. Savoy also noticed Mother's black eye, multiple small holes in the wall and door, and the extensive clutter. Ms. Savoy expressed her concerns of possible domestic violence, but Mother denied it. N.T. 7/13/2021 at 51-52.

Ms. Savoy suspected Paternal Grandmother was no longer living in the apartment after Father had indicated, in response to her questioning, that the second bedroom belonged to a "roommate." When Ms. Savoy asked where Paternal Grandmother was, Father responded, "oh, that's her room." N.T. at

56, 57, 58. Ms. Savoy, however, found it peculiar that Father would refer to his own mother as a "roommate" and saw no indication of a woman using that bedroom. *Id*.

Ms. Savoy sought information on Paternal Grandmother's whereabouts, but Mother and Father insisted they were allowed to watch Child without the supervision of Paternal Grandmother. When pressed, Father advised that Paternal Grandmother was in New Jersey with her fiancé.

Ms. Savoy immediately had Father place a phone call to Paternal Grandmother, who asserted that she maintained custody of the Child and was permitted to allow parents to visit with Child in her absence. N.T. at 52-54. She denied Ms. Savoy's suggestion that she appeared to have moved from her Philadelphia apartment. When Paternal Grandmother indicated she would return promptly to retrieve Child and take him with her to New Jersey, Ms. Savoy advised that would not be allowed because of the open investigation into Child's welfare. N.T. at 55.

After determining that all persons named as Safety Plan placement resources were either unfit or unavailable, Ms. Savoy requested and obtained an Order of Protective Custody. N.T. at 60. Subsequently, police were called to the scene to maintain peace given the number of people present and because Paternal Grandmother, who had returned to her apartment in the meantime, became antagonistic when DHS began to pack up Child's belongings. N.T. a 6-61.

On the next day, the trial court conducted a shelter care hearing and entered an order acknowledging that despite reasonable efforts by DHS to eliminate the need for Child's removal from the home, the best interests of Child required that DHS assume temporary care and legal custody of Child. Order, 3/3/21. On March 8, 2021, DHS filed a dependency petition on behalf of Child.

On July 13, 2021 and August 9, 2021, the court conducted a combined Adjudicatory and Disposition Hearing on the dependency petition. In addition to addressing the events recounted above, DHS presented evidence pertaining to Paternal Grandmother's actual place of residence, her time with Child, and parents' respective recent drug use.

Specifically, Ms. Savoy related that Paternal Grandmother had testified, "I reside in New Jersey, but I live in Philadelphia[,]" at both the March 3, 2021 Shelter Care Hearing and the March 29, 2021, Twenty-Day Meeting with DHS. N.T. at 67.

Paternal Grandmother attempted to clarify that she reported to DHS not that she lived at the Philadelphia home but only that it was her permanent address for purposes of billing and her official, government-issued documentation and identifications. She testified that she had not stayed overnight in her DHS-approved Philadelphia apartment since October of 2020, N.T. 8/9/21 at 41-42, and asserted that she did not realize she could not allow parents to "watch" Child in her absence. N.T. at 67. Such testimony, however

stood in stark contrast to the statement attributed to her by Ms. Walker-Richards, who recounted Paternal Grandmother's earlier claim, made during the investigation of the first GPS, that she never leaves Child alone with Mother and Father because of their problems with addiction. N.T. 7/13/21 at 24.

Paternal Grandmother also admitted on the stand that she knew of parents' long-term substance abuse problems and suspected there were times in the last six months when they had been under the influence while with Child. N.T. 7/13/21 at 14, 33. She claimed, however, that parents' expressed willingness to obtain treatment, and Father's participation in a treatment program, reassured her that Child would be safe in their care, even though she never demanded to see drug screen results to verify their compliance. N.T. at 30-37; 8/9/21 at 29-30, 37.

Ms. Savoy also addressed the issue of parents' continued drug use when she testified that both appeared intoxicated at the March 3, 2021 shelter care hearing. According to Ms. Savoy, Mother continually nodded off during the hearing, admitted to "struggling" with substances just before taking a forthwith urine screen, and supplied a urine sample that tested positive for marijuana, N.T. at 63-64. Ms. Savoy also related that Father reacted to her request that he submit to a forthwith screening with a verbally offensive refusal as he left the courthouse. N.T. at 64.

Community Umbrella Agency (CUA) Case Manager Stephanie Payne testified to experiences on her visits with Mother and Father that mirrored those related by Social Workers Walker-Richards and Savoy, respectively. Specifically, Ms. Payne described how the parents frequently dozed, struggled to maintain conversation with her, and, at times, had company in the home who were in a similar state. N.T. 7/13/21 at 103-105. She recounted how on one occasion a drowsy Mother struggled to speak and to read and sign documents, with her pen frequently trailing off the page in mid-signature. N.T. 7/13/21 at 101-02, 129-32. Similarly, Father twice nodded off momentarily during a visit. N.T. at 107-111, 132. They showed frustration whenever Ms. Payne would advise them she was ending a visit because of their behavior. N.T. at 111-113.

Finally, Father and Mother testified. Father explained that he refused to sign releases of information because he distrusted DHS workers, who, he maintained, lied about him at previous hearings. N.T. at 8/9/21 at 61-62. He told the court he had been "clean" for 87 days by keeping company with good people and going to Narcotics Anonymous and Cocaine Anonymous three days per week through the CleanSlate program, and he, therefore, decided he no longer needed to remain on a Suboxone maintenance program. N.T. at 62. However, he had no certificates to substantiate his claims of program completion, he conceded that he declined one request for a urine screen, and

he alleged LabCorp mishandled two subsequent urine samples he provided, although he supplied no evidence to support this claim. N.T. at 66-67.

Mother testified that she has maintained sobriety since giving birth to Child while at Libertae, whose drug program she claimed to complete successfully. N.T. at 73. This testimony conflicted with both testimonial and documentary evidence submitted earlier by DHS showing Mother was dismissed from Libertae for a positive methamphetamine test. N.T. at 7/13/21 at 95. Mother also alleged she had failed to provide a urine sample on April 22, 2021 only because LabCorp rejected the sample she gave as inadequate in amount and told her a new script was necessary for re-testing. N.T. 8/9/21 at 74-75. She attributed her chronic drowsiness to suboxone treatments administered by her physician, who, she testified, requires her to attend a support group three times a week and complete drug testing to remain under her care. N.T. at 82-84.

At the conclusion of argument, the court determined that DHS presented clear and convincing evidence to adjudicate Child dependent. Specifically, the court found: (1) Paternal Grandmother violated the prior court order naming her as Child's sole legal guardian by leaving Child in the sole physical custody of Mother and Father; (2) exigent circumstances existed requiring Child's removal from the Philadelphia home; (3) continued placement of Child in the home was contrary to his health, safety, and welfare; and, (4) that court-involved and agency-monitored kinship placement of Child

with New Jersey resident Paternal Grandmother was appropriate if New Jersey permitted such monitored placement through its approval of ICPC. Paternal Grandmother's motion for reconsideration was denied, and this timely appeal followed.

Paternal Grandmother raises the following issues for this Court's consideration:

1. Whether the trial court erred as a matter of law or abused its discretion in finding that the Philadelphia Department of Human Services met its burden to prove, by clear and convincing evidence, that A.S. was a dependent child.

2. Whether the trial court erred as a matter of law or abused its discretion in finding that the Philadelphia Department of Human Services met its burden to prove that it was clearly necessary to remove A.S. from his family.

3. Whether the trial court erred as a matter of law in making the pre-placement finding required by 23 Pa.C.S.A. § 6351(b)(2) of the Pennsylvania Juvenile Act, by determining that the Philadelphia Department of Human Services made reasonable efforts to prevent or eliminate the need for the removal of A.S. from his home.

4. Whether the trial court as a matter of law in ordering that the Philadelphia Department of Human Services [] transfer custody of A.S. to L.S. via an Interstate Compact for the Placement of Children, where the placement of A.S. with L.S. was not for the purpose of placement in foster care.

Brief for Appellant, L.S., at 3.

Paternal Grandmother's first three issues coalesce to contend that removal of Child from her custody and Philadelphia home was unnecessary where evidence of both Child's dependency and reasonable efforts by DHS to prevent the need for removal was lacking. We review these issues collectively

for an abuse of discretion, which "requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010).

Dependency matters are governed by the Juvenile Act, 42 Pa.C.S. §§ 6301-6475. This Court has explained:

> A "dependent child" is defined, in relevant part, as one who is "without proper parental care or control, subsistence, education as required by law or other care or control necessary for his physical, mental or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian, or other custodian that places the health, safety or welfare of the child at risk[.]" 42 Pa.C.S. § 6302. "The question of whether a child is lacking proper parental care or control so as to be a dependent child encompasses two discrete questions: whether the child presently is without proper parental care and control, and if so, whether such care and control are immediately available."

**In re D.A.**, 801 A.2d 614, 619 (Pa.Super. 2002) (*en banc*).

> The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency.

**In re G.T.**, 845 A.2d 870, 872 (Pa.Super. 2004) (cleaned up).

Following a finding of dependency, the trial court may make an order for the child's disposition, which is "best suited to the safety, protection and

physical, mental, and moral welfare of the child." 42 Pa.C.S. § 6351(a). The

Juvenile Act provides, in relevant part:

**§ 6351. Disposition of dependent child.**

**(a) *General rule.*** — If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

....

**(b) *Required preplacement findings.*** — Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:

(1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and

(2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the

need for removal of the child from his home, if the child has remained in his home pending such disposition; or

(3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances[.]

....

42 Pa.C.S. § 6351(a), (b).

A court may not separate a child from his or her parent "unless it finds that the separation is clearly necessary." *In re G.T.*, *supra* at 873 (citation omitted). "Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody." *Id*. (internal quotations and citations omitted).

In contesting the court's dependency and placement determinations, Paternal Grandmother contends the court erroneously focused on the parents' continued drug use with others in Child's sanctioned home while ignoring that Paternal Grandmother, Child's legal guardian, was not suspected of such conduct and remained available as a resource to Child. We disagree.

From the beginning of November 2020 until March 2021, Paternal Grandmother no longer lived with Child notwithstanding a court order placing Child in her exclusive custody and despite her "suspicions" that Mother and Father were acting on their addictions. It was only a prompt DHS investigation of reports filed by concerned neighbors that disclosed Paternal Grandmother's desertion of Child and the apparent drug use occurring in Child's home.

- 15 -

Under this evidentiary record, the trial court found that proper care and control was not immediately available from Paternal Grandmother despite her request to take custody of Child in her New Jersey home. In particular, the court concluded that Paternal Grandmother was no longer a credible resource who could be deemed readily able to provide the care Child needed. Instead, she would require court supervision and agency assistance, as well as the approval of the state of New Jersey, in which her primary residence had been located for the previous ten months. To this end, the court observes:

> Therefore, this court found that DHS had shown by clear and convincing evidence that the Child was without proper parental and custodial care, and that such care was not available immediately due to parents['] active drug addictions and Paternal Grandmother's irreparable breach of safety and custodial obligation that now necessitates court-monitoring but which is not easily remedied by virtue of her having become a legal resident of a different jurisdiction thereby requiring New Jersey to approve Paternal Grandmother for monitoring in that state. The testimony heard by this court was clear, direct, weighty, and convincing that the Child's health, safety, and welfare were at risk and continue to be at risk, and thus the Child was adjudicated dependent.

Trial Court Opinion, at 23.

The evidentiary record supports the court's finding that Paternal Grandmother was not immediately available to provide parental and custodial care, as she had violated the court order that gave her exclusive guardianship over Child when she chose to leave Child to parents' sole custody and move in with her fiancé' in his New Jersey home.

Nevertheless, though it entered a removal order, the court preserved the possibility of reinstatement of Paternal Grandmother as legal guardian

when it ordered DHS to retain custody of Child and make a referral to New Jersey that it assess whether it viewed Paternal Grandmother as a suitable resource for Child under the Interstate Compact for Placement of Children (ICPC). Once DHS and New Jersey give approvals within the ICPC rubric, the court noted, then "Child can be placed with PGM in NJ." Order of Adjudication, 8/9/21. Consistent with this order, the court maintained a permanency goal of reunification. *See Interest of A.C.* 237 A.3d 553, 566 (Pa. Super. 2020) (recognizing that retaining goal of reunification bears on the question of a removal order's appropriateness). We therefore find the court properly declared Child dependent and ordered his removal from Paternal Grandmother and her Philadelphia residence pending the ICPC review.

Similarly meritless is Paternal Grandmother's third issue charging that DHS failed to demonstrate it made reasonable efforts to prevent or eliminate the need to remove Child from his family and place him in foster care, as required by Section 6351(b), *supra*. Specifically, Paternal Grandmother argues that removal of Child was a "knee jerk reaction to what essentially amounted to a noise complaint. The Child was unharmed, there were no drugs in the home, and Grandmother had a fine home in New Jersey." Brief for Appellant, at 31.

She continues that the March 2021 GPS report leading to Child's removal contained essentially the same allegations as were made in the July 2020 GPS report, when DHS elected to leave Child in Paternal Grandmother's care. Yet,

she claims, unlike in the previous investigation, DHS did not offer services to the parents. "If DHS considered the parents to be a danger to the Child, it should have offered services", Paternal Grandmother maintains. *Id*.

Paternal Grandmother relies on *In the Interest of S.A.D.*, 555 A.2d 123 (Pa. Super. 1989), *In the Interest of James Feidler*, 573 A.2d 587 (Pa. Super. 1990), and *In re W.M.*, 41 A.3d 618 (Pa. Super. 2012), to support her position that DHS did not take reasonable efforts to prevent Child's placement. *Id.* at 28-30. Mother also argues that the trial court erred in failing to make a finding that the lack of preventative services was reasonable under the circumstances. *Id.* at 27. In sum, Mother contends that the trial court erred by failing to consider the findings of fact required by 42 Pa.C.S. § 6351(b) and Pa.R.J.C.P. 1514(A)(5). *Id*.

The cases upon which Paternal Grandmother relies are inapposite to the present matter. In *S.A.D.*, a young, homeless mother sought assistance for herself and her 14-month old child from the county agency. She was told her only option was to voluntarily place her child in agency custody until she could "get herself together and find a place [to stay] and get some employment so she could have her daughter back." *Id*. at 125.

Several weeks later, after she was employed in a $3.60 per hour job and residing with the family of a friend, mother asked for the return of her child. Though there was no evidence of abuse or neglect, the agency still refused to reunify the mother and the child. *Id*.

- 18 -

A dependency hearing occurred shortly thereafter, where the sole testimony "was that of a CYS caseworker who repeatedly testified that Mother should find a more suitable place to live but acknowledged that neither she nor any other caseworker had visited the home where Mother was then living. The caseworker acknowledged that it was obvious that Mother could not afford a place of her own based on her minimal earnings but insisted that Mother find a more suitable place to live." *Id*.

On appeal, we reversed the trial court's adjudication of dependency, finding that the agency failed to present clear and convincing evidence of dependency and failed to make reasonable efforts to prevent the separation of mother and child. *Id*. Specifically, we noted:

> Our review of the record reveals a very young, unwed mother, lacking financial resources and housing who was unemployed. The mother, in a responsible fashion, turned to CYS to obtain assistance to provide and care for her child. There is no evidence that this young mother in any way neglected or abused her child. CYS has failed to present clear and convincing evidence to establish dependency and has failed to make reasonable efforts to prevent the separation of the mother and child.

*Id*.

In *Feidler*, this Court concluded that the trial court abused its discretion by finding that the removal of children from the parents' home was necessary because the parents violated the conditions the trial court had previously imposed for keeping their children. *Feidler*, 573 A.2d at 590-91. In addition to finding that the record did not support the trial court's findings that the parents violated the agency's conditions, the *Feidler* Court noted that the

"record upon which to justify removal of [the] children from their family home" was "woefully inadequate." ***Id.*** at 589.

Here, in contrast to ***S.A.D.*** and ***Feidler***,[2] the record contains ample evidence of the agency's efforts to meet with Paternal Grandmother and parents on multiple occasions, visit their Philadelphia home, and offer them services which would address their needs. The family, however, declined the offer of assistance. Indeed, Paternal Grandmother ignores that it was she who reassured DHS Social Workers that Child was safe with her as his sole legal guardian, as he would be either in her direct care or delivered to other family when she worked and, thus, never left alone with Mother and Father.

Moreover, unlike in Paternal Grandmother's cited cases, DHS in the case *sub judice* witnessed conditions at the approved Philadelphia residence which warranted Child's immediate removal and the court's finding of dependency.

During the investigation of the residence in March of 2021, DHS discovered that Paternal Grandmother had vacated her Philadelphia residence months earlier in contravention of the court order placing her in sole physical

_____

[2] We find Paternal Grandmother's reliance on ***W.M.*** wholly unpersuasive. ***W.M.*** considered an agency's responsibilities in the context of a voluntary placement agreement and federal foster care maintenance payment funding. ***See W.M.***, 41 A.3d at 627-29. To the extent ***W.M.*** commented on the reasonableness of the agency's efforts, that discussion was *dicta*. ***See id.*** at 629 (indicating that this Court refused to consider the agency's claim of reasonable efforts because the issue was not preserved in its Rule 1925(b) statement, and further, noted that the trial court found that the agency's efforts were reasonable).

and legal custody of Child. Observed in Paternal Grandmother's absence were Child's parents in the company of five other adults, all of whom appeared to be in various states of intoxication at midday, including one who was identified as a roommate and two others pretending to be a cleaning service attending to a significantly disordered apartment. Mother had a black eye, and there were holes in the wall and interior doors indicative of physical violence.

Such evidence was presented to the court the following day at the shelter care hearing, and it supported the court's conclusion that Child's emergency removal was necessary for his welfare and in his best interests pursuant to Pa.R.J.C.P. 1210(B). Accordingly, we conclude the record belies Paternal Grandmother's claim that DHS failed to make reasonable efforts to prevent Child's placement.

In her final issue, Paternal Grandmother argues that the trial court erred when it deemed an ICPC necessary for DHS to transfer custody of Child to her in New Jersey.

Article III(a) of the ICPC provides as follows:

No sending agency shall send, bring or cause to be sent or brought into any other party state, any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article[,] and with the applicable laws of the receiving state governing the placement of children therein.

62 P.S. § 761[6]; *see also* 62 P.S. § 761, Article II(d) (defining "placement," in relevant part, as "the arrangement for the care of a child in a family, free or boarding home, or in a child caring agency or institution....").

- 21 -

Additionally, Article V(a) states, in relevant part, as follows:

The sending agency shall retain jurisdiction over the child sufficient to determine all matters in relation to the custody, supervision, care, treatment and disposition of the child which it would have if the child had remained in the sending agency's state until the child is adopted, reaches majority, becomes self-supporting, or is discharged with the concurrence of appropriate authority in the receiving state. ... The sending agency shall continue to have financial responsibility for support and maintenance of the child during the period of the placement....
*Id.*

***D.Q. v. K.K.***, 241 A.3d 1112, 1118–19 (Pa.Super. 2020)

Paternal Grandmother posits that an ICPC applies only when transferring a child to another state for the purposes of foster placement or adoption, ***see*** 62 P.S. § 761, 55 Pa. Code § 3130.41, whereas, here, the trial court simply intends to transfer Child to her in her continuing capacity of legal guardian, which would not necessitate application of the ICPC.

DHS responds that Paternal Grandmother misconstrues the trial court's Order of Adjudication and Disposition, which did not ratify the prior Bucks County court order previously giving her custody over Child but, rather, allows for the prospect of Child's "placement" with her in New Jersey only if an ICPC with New Jersey is approved.

In this regard, DHS posits that the present matter comes directly under this Court's recent decision in ***D.Q.***, where we held that under the ICPC, the orphans' court of Schuylkill County Court of Common Pleas was required to obtain state approval from the receiving state, New Hampshire, prior to

placing the subject grandchildren with their maternal grandmother in New Hampshire. *Id.* at 1122 (citing 62 P.S. § 761; 55 Pa. Code § 3130.41):

> Under the ICPC, Schuylkill County CYS must have an ICPC request completed in order to assess Maternal Grandmother as a placement option. *See* 62 P.S. § 761; 55 Pa. Code § 3130.41). As the sending state, Pennsylvania is required to obtain state approval from the receiving state, New Hampshire, prior to sending the Children to placement in another state. *See* 55 Pa. Code § 3130.41. Under the circumstances, the trial court appropriately required Maternal Grandmother to complete the ICPC so that CYS could obtain more information about the safety of the Children before the court in Pennsylvania would send them to be in her custody in New Hampshire.[]

*D.Q.* at 1122.

Relatedly, DHS notes that Paternal Grandmother, as a prospective "placement option" in the present matter, falls squarely under the ICPC definition for "placement", which, as noted *supra*, means "the arrangement for the care of a child in a family, free or boarding home, or in a childcare agency or institution. . . ." 62 P.S. §761, Article II(d). Under applicable regulations applying the ICPC, DHS continues, the terms "family free" or "boarding home" are interchangeable and "mean[] the home of a relative or an unrelated individual whether or not the placement recipient receives compensation for care or maintenance of the child . . . ." ICPC Resource Manual, Regulation 3 (4)(8) ("boarding home"), (4)(24) ("family free").

Guided by *D.Q.*, we find the trial court appropriately retained jurisdiction over Child while implementing the ICPC both to obtain New Jersey's approval of the prospective placement and to allow DHS to assess the safety of Child

in Paternal Grandmother's New Jersey home before effectuating such placement. Accordingly, we deny relief on Paternal Grandmother's final issue.

For the foregoing reasons, we affirm the order entered below.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/2022