J-S22003-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: S.A.M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 248 WDA 2023 |

Appeal from the Order Entered January 23, 2023
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-22-0176

| | | |
|---|---|---|
| IN RE: ADOPTION OF B.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S., JR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 249 WDA 2023 |

Appeal from the Order Entered January 23, 2023
In the Court of Common Pleas of McKean County Orphans' Court at
No(s): 42-22-0247

BEFORE:  OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY OLSON, J.:                    **FILED:  July 21, 2023**

Appellant, J.S., Jr., ("Father") appeals from the January 23, 2023 orders[1] entered in the Court of Common Pleas of McKean County that terminated his parental rights to his dependent children, S.A.M.S., a female

---

[1] On April 11, 2023, this Court *sua sponte* consolidated the two appeals docketed with this Court at 248 WDA 2023 and 249 WDA 2023. ***See*** *Per Curiam* Order, 4/11/23.

child born March 2010, and B.J.S., a male child born November 2007, (collectively, "the children") pursuant to Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938.[2]  Counsel for Father, Christopher J. Martini, Esquire ("Attorney Martini") filed an **Anders** brief[3] and a petition to withdraw as counsel.  We vacate the January 23, 2023 orders and remand in accordance with this memorandum.  Attorney Martini's petition to withdraw as counsel for Father is denied.

The trial court summarized the factual history as follows:

Father's involvement with [McKean County Children and Youth Services ("CYS")] and dependency proceedings goes back more than a decade.  There was a previous finding of dependency against [Father and Mother] in 2009.  The [trial] court found that [Father, Mother,] and [their six] children were homeless and "living a nomadic lifestyle."  In 2011[, Father and Mother] faced criminal charges for abusing the [six] children.  It was asserted that, in April [] 2011, [Father, Mother,] and [six] children, including [S.A.M.S. and B.J.S.], were residing in a [house] with feces and urine from animals throughout the home, including on the floors and walls.  There was also rotten food on the counters and throughout the home.  The [house] was declared a health hazard.  [S.A.M.S.] was found to have a filthy diaper and a [methicillin-resistant staphylococcus aureus ("MRSA")] infection.  The [six] children were removed by CYS.  Father was convicted [] of endangering the welfare of a child, with the listed victims being [the six] children[,] including [S.A.M.S. and B.J.S.]  He was

_____

[2] The biological mother of the children ("Mother") is deceased.

[3] **Anders v. California**, 386 U.S. 738 (1967); **see also Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009); **Commonwealth v. McClendon**, 434 A.2d 1185 (Pa. 1981).  The **Anders** principles and process have been extended to appeals involving termination of parental rights.  **In re X.J.**, 105 A.3d 1, 3 (Pa. Super. 2014).

sentenced on November 17, 2011[,] to [] 30 days to 12 months['
incarceration].

After Father's conviction, Mother and Father separated. On April
12, 2013, the [trial] court issued an order terminating the
dependency action and CYS supervision. The [trial] court
indicated in that order[,] "Although there have been some
concerns, overall there has been substantial progress regarding
the reunification plan with Mother. All six of the children have
returned to Mother's physical care. She has provided for their
needs and reached out for assistance and support when she
needed [it.] Physical and legal custody is returned to Mother."
The [trial] court repeatedly found in the prior review hearings that
Father had not made progress [regarding his reunification plan].
He did not attend many of the scheduled visits[,] and he did not
follow through with his medication management and mental
health treatment. Therefore, there is a history of CYS and the
[trial] court working with Father in the past for over 12 years and
[Father] making no progress regarding his ability to safely parent
the children.

Sadly, after custody was returned to Mother, Mother passed.
Since Mother passed and there was no ongoing dependency case,
Father took custody of the children. Father resided at a hotel in
downtown Bradford, Pennsylvania[.] There were serious concerns
regarding this housing. The facility has multiple rooms and
short- and longer-term occupants who reside above a bar area
[located] on the first floor [of the building]. There [were]
increased incidents of crime in the area and the complex. Father
resided there with his paramour[.] There were only a couple of
rooms [in Father's apartment] with the children's area being
separated, at times, with a sheet. Richard Fry[ ("Fry"), a CYS]
caseworker for the family in 2021, testified that [S.A.M.S and
B.J.S.] were sleeping on the floor of the hotel room at one point.
Father [] resided at the [hotel] for years. There was concern for
the children from school staff. CYS staff was monitoring the family
in 2021[,] before a dependency action was initiated. Father was
encouraged to obtain different housing but did not do so. [] Fry
testified that he advised Father that he could relocate the family
to the "CYS Safe House" while he [awaited] more permanent
housing, but Father refused and did not make any efforts to obtain
housing assistance, despite being encouraged to do so. [] Fry
testified that "I worked with him for close to 3 years to get him to
more suitable housing."

Julie Speaker[ ("Speaker"),] a counselor at School Street Elementary in Bradford, [] where [S.A.M.S.] and her siblings attended, testified at the 2021 initial dependency hearing that she had extensive contact with [the children, including S.A.M.S, B.J.S., and their brother, who is not a party to a termination action currently before this Court,] and[ the children] have been in Father's custody for at least the last 3 years. She explained that Father initially had a [house] and the family resided there. For some reason they vacated that [house] and moved into the [hotel]. She explained that the [hotel] is not an appropriate place for children to reside. [] Speaker is clearly a very dedicated counselor and looked out for these children, beyond her standard duties as a counselor. She has been worried about the welfare of the children the entire time that she has known them. She would take school meals to the [hotel] for the children. [W]orking with others at the school, [Speaker] provided the children with shoes, jackets[,] and clothing. She has taken Christmas gifts for the children to their room at the [hotel]. She explained that the rooms there are typically occupied, on a temporary basis, by individuals [residing] in the City of Bradford who have no other housing options. She described the heavy smoke in the hallways ("like smoking a pack of cigarettes when you walk through there")[,] and[ there was a] frequent smell of burnt marijuana in the hallways. She explained that the children often sit in the hallway as the space in [their hotel] room was limited. [Speaker] bought [the children] chairs once for Christmas so [] they would not have to sit [] in the hall[way] on the floor. She indicated that there were reports of physical abuse by Father [against] the children. However, when these allegations were reported[,] the children would recant []or the other children would not verify the reports. She explained that [both S.A.M.S. and B.J.S.] had a good relationship with her and school staff.

On January 13, 2021, when [S.A.M.S.] got off the bus [at] school, she immediately approached [] Speaker and indicated that she wanted to talk because she "had a really bad night." [S.A.M.S.] explained to [Speaker] that her Father had made the children clean the apartment and, when he was not happy with how it looked, he "trashed the room." [S.A.M.S.] explained how Father physically assaulted the children. [] Speaker then reported the allegations and called the [administrative offices] at the Fretz Middle School, where [B.J.S. and his brother] were students, to let [school officials] know that someone needed to speak to [B.J.S. and his brother]. Assistant Principal Nicholas LaBella [("Principal

LaBella") met with the two boys. Initially the boys thought that the meeting was about their school assigned computers and "that they were in trouble." Principal LaBella [] talked to the boys the day before about their computers. [Students] are required to take their computers home in order to complete assignments[.] For a bizarre reason[,] Father prohibited the children from having the computers in the hotel room. When they did bring [the computers to the hotel room, Father] would take [the computers] into his custody and keep them in his and his paramour's bedroom. One of the children had to "sneak into" the bedroom and get the computer without Father knowing to complete his [homework] assignment. Principal LaBella explained to the boys that he was not meeting with them about their computers, and[] that he had heard [] they [] had a rough night the night before. [B.J.S.'s brother] told Principal LaBella that he had been physically assaulted by Father, including being thrown against a wall and punched and kicked. Initially [B.J.S.] "looked down" and did not provide any information. However, when [his brother] said "he [choked] you too," [B.J.S.] also provided details regarding physical abuse. The [three] children were then interviewed at the McKean County Children's Advocacy Center by trained examiners. All [three children] described a pattern of physical abuse by Father, including [choking], punching, kicking[,] and throwing the children. Some of the incidents of [choking] involved the child/victim passing out and losing consciousness.

A new dependency petition was filed in January [] 2021. The [trial] court found that all [three] children were extensively[,] physically[,] and emotionally abused by Father. Criminal charges were filed against Father and his paramour[] regarding their physical abuse of the children. On December 10, 2021[,] Father [pled] guilty to three counts of simple assault and one count of endangering the welfare of children. Father agreed that he [] assaulted [S.A.M.S., B.J.S., and their brother] and failed to protect their welfare. On December 10, 2021[, Father] was sentenced to an aggregate [term] of [] 1 year to 2 years['] incarceration plus 3 years of concurrent probation. Father's paramour[] proceeded to a jury trial on October 19, 2021[,] to address the allegations that she abused and assaulted the children. She was found guilty by a jury of 4 counts of simple assault, 2 counts of strangulation[,] and 1 count of endangering the welfare of children. She was sentenced on December 14, 2021[,] to an aggregate [term] of 1 [] to 2 years['] incarceration

plus 2 years of consecutive probation. Founded reports of child abuse [were] issued against both Father and [his paramour].

In the initial disposition for dependency in January [] 2021, Father was ordered to

> Father shall obtain an updated mental health evaluation. The evaluator shall be provided a copy of the [trial] court's [dependency] findings regarding the abuse of the children. Father shall demonstrate that he recognizes the abuse that he [] caused [] the children and [that he] is productively working to address [the abuse] and his anger management control issues in treatment. He shall sign all releases requested by CYS for his mental health records. Father shall also obtain an updated drug and alcohol evaluation[] and follow his recommended treatment plan, if any. Father shall demonstrate that he has an appropriate home that is clean and safe and appropriate for the return of the children.

Father attended an initial evaluation at "The Guidance Center" in Bradford on April 15, 2021. Despite the [trial] court having specifically ordered that "Father shall demonstrate that he recognizes the abuse that he [] caused [] the children and [that he] is productively working to address it and his anger management control issues in treatment[," Father's evaluator noted "Father] stated that on [January 21, 2021, his] three children made allegations that he choked [S.A.M.S.] to the point of black out, along with assaulting [B.J.S. and his brother. Father] stated that he never touched [the children]." Of course, this statement directly contradicts his later plea of guilty to criminal charges for assaulting the children.

After his initial evaluation, [in] which he provided false facts[,] Father did not follow through with treatment. Kiersten Schlowder [("Schlowder")], an employee at [T]he Guidance Center, testified that Father was referred to the Nurturing Parents Program shortly after the finding of dependency in 2021[,] but he never followed through. On April 20, 2021[, Father] was recommended for further mental health counseling, but he never followed through. Father testified at the termination hearing and, when asked why he didn't follow through with mental health and anger management treatment, he stated that he "didn't know where to go to get help["] and[] "I was never found that I had any problems." The assertion that he didn't know where to go is contradicted by the testimony from [] Schlowder that he was

evaluated at [T]he Guidance Center and advised to make contact to schedule further counseling, but he never made contact with them. Father then [asserted] that everyone has difficult days like he had[,] but[] he should not have done what he did.

Father has not made any progress regarding housing. Despite the [trial] court specifically indicating at prior dependency hearings that the [hotel] was not an appropriate place for housing, Father testified[,] "The [hotel] does not bother me. It was okay when I was living there with my parents." Father has been offered assistance with [obtaining] housing but [] repeatedly refused to pursue it. Father has not had appropriate housing since the finding of dependency, he has made no efforts to obtain appropriate housing[,] and he has not and does not recognize the need to [obtain appropriate housing].

[S.A.M.S.] is residing with her foster mother[ in] McKean County[. The] residence is about a mile away from [the house, where B.J.S.] resides[.] The [foster families] have a very close relationship[,] and [S.A.M.S.] has frequent contact with [B.J.S.] The families are involved in many activities together. [S.A.M.S.] has been in [her foster mother's] care since August [] 2021. She is very bonded with [her foster mother] and her extended family. Despite the extensive trauma that she [] endured, including but not limited to[,] 1) living in a filthy home as an infant, 2) having a [MRSA] infection as an infant due to lack of care and cleanliness, 3) having her Mother pass after being in placement for years and finally being returned to her care, 4) having to reside in a questionable hotel, sleeping on the floor[,] and being separated by her Father and his paramour by only a sheet, 5) being [choked] and physically assaulted by her Father and his paramour, 6) having a school official provide her[,] and her siblings[,] chairs so they didn't have to sit on the floor [in] a cigarette and marijuana smoke filled hallway [] of a questionable hotel, 7) being removed (again) from her Father's care and having to be a witness against her Father and his paramour because they initially, and for months [after], denied abusing her before Father agreed that he [did abuse the children], and[] 8) being in several different foster homes during her life, [S.A.M.S.] is thriving in [her foster mother's] care. She attends school regularly, is bright and obtains good grades, is involved in many extracurricular activities at school including choir and band[,] and has many friends.

[S.A.M.S.] does not want to have any contact with her Father. When she was initially placed, she would read letters that he sent.

However, she then indicated that she did not want to receive them. She has a very negative bond with her Father. She very much wants to be adopted by [her foster mother] and for her Father's parental rights to be terminated.

Trial Court Opinion (S.A.M.S.), 1/23/23, at 1-8 (record citations, footnote, and extraneous capitalization omitted).

[B.J.S.] is residing with his foster parents[,] about a mile away from [S.A.M.S. s foster home. S.A.M.S.'s foster mother is the daughter of B.J.S.'s foster parents. The two foster families] have a very close relationship[,] and [B.J.S.] has frequent contact with [S.A.M.S.] The families are involved in many activities together. [B.J.S.] has been in [his foster parents'] care since August [] 2021. He is very bonded with [his foster parents] and their extended family. Despite the extensive trauma that [B.J.S.] has endured, including but not limited to[,] 1) living in a filthy home and being placed [in foster care] as a young child in 2009, 2) having his Mother pass after being in placement for years and finally being returned to her care, 3) having to reside in a questionable hotel, sleeping on the floor and being separated by [his] Father and his [Father's] paramour by only a sheet, 5) being [choked] and physically assaulted by [his] Father and his [Father's] paramour, 6) having a school official provide him, and his siblings[,] chairs so they didn't have to sit on the floor [in] a cigarette and marijuana smoke filled hallway [] of a questionable hotel, 7) being removed (again) from his Father's care and having to be a witness against his Father and his [Father's] paramour because they initially, and for months [after], denied abusing him and his siblings before Father agreed that he [did abuse the children], and, 8) being in several different foster homes during his life, [B.J.S.] is doing very well at [his current foster home]. He struggles with some classes but attends school regularly[,] and[] [his foster parents] motivate him to improve his grades. He plays sports and has friends. He enjoys family events with [his foster parents] and their extended family.

[B.J.S.] does not want to have any contact with his Father. He has a very negative bond with his Father. He very much wants to be adopted by [his current foster parents] and make the stability that he has with [his foster parents] permanent.

Trial Court Opinion (B.J.S.), 1/23/23, at 7-8.

The record demonstrates that, on June 15, 2022, CYS filed a petition for involuntary termination of Father's parental rights to S.A.M.S. pursuant to Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8). **See** Petition for Involuntary Termination of Parental Rights of Father (S.A.M.S.), 6/15/22, at ¶9. On August 24, 2022, CYS filed a petition for involuntary termination of Father's parental rights to B.J.S. pursuant to Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8).[4] **See** Petition for Involuntary Termination of Parental Rights of Father (B.J.S.), 8/24/22, at ¶9. CYS was represented by Michele D. Alfieri-Causer, Esquire ("Attorney Alfieri-Causer"). Attorney Martini was appointed to represent Father, and Casey Graffius, Esquire ("Attorney Graffius") represented the legal and best interests of the children as their guardian *ad litem*.

On January 23, 2023, the trial court found that, with respect to both petitions, CYS met its burden of proof under Sections 2511(a)(1), (a)(2),

---

[4] Conspicuously absent from both the June 2022 and August 2022 termination petitions is an allegation that Father's parental rights to the children should be terminated pursuant to Section 2511(b). A petition for involuntary termination of parental rights should contain such an allegation with citation to Section 2511(b). **See** 23 Pa.C.S.A. § 2512(b)(1) (stating, "[t]he petition should set forth specifically those grounds and facts alleged as the basis for terminating parental rights").

(a)(5), and (a)(8) of the Adoption Act, and subsequently terminated Father's parental rights to the children.[5]  This appeal followed.[6]

Preliminarily, we must address Attorney Martini's petition to withdraw and the accompanying **Anders** brief, both alleging this appeal is frivolous.[7] "When presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw." **Commonwealth v. Daniels**, 999 A.2d 590, 593 (Pa. Super. 2010) (citation omitted).  In order to withdraw pursuant to **Anders**, "counsel must file a brief that meets the requirements established by our Supreme Court in [**Santiago**, **supra**]." **Commonwealth v. Harden**, 103 A.3d 107, 110 (Pa. Super. 2014) (parallel citation omitted).  Specifically, counsel's **Anders** brief must comply with the following requisites:

> (1) provide a summary of the procedural history and facts, with citations to the record;
>
> (2) refer to anything in the record that counsel believes arguably supports the appeal;

---

[5] The trial court made no determination as to whether CYS met its burden under Section 2511(b).

[6] Father filed concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i), along with his notices of appeal, on February 22, 2023.  The trial court filed its Rule 1925(a) opinions on March 7, 2023.

[7] In his **Anders** Brief, Attorney Martini raised the following issue for our review: "Whether the issues raised in the instant appeal are frivolous?" **Anders** Brief at 7.

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*Id.* (citation omitted).

Pursuant to ***Commonwealth v. Millisock***, 873 A.2d 748 (Pa. Super. 2005), and its progeny, "[c]ounsel also must provide a copy of the ***Anders*** brief to his [or her] client." ***Commonwealth v. Orellana***, 86 A.3d 877, 880 (Pa. Super. 2014) (internal quotation marks and citation omitted). The brief must be accompanied by a letter that advises the client of the option to "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the ***Anders*** brief." ***Id.*** "Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." ***Commonwealth v. Goodwin***, 928 A.2d 287, 291 (Pa. Super. 2007) (*en banc*) (citation and internal quotation marks omitted).

Instantly, Attorney Martini satisfied the technical requirements of ***Anders*** and ***Santiago***. In his ***Anders*** brief, counsel identified the pertinent factual and procedural history and made citation to the record. Counsel raises one claim challenging the trial court's involuntary termination of Father's parental rights to the children under Sections 2511(a)(1), (a)(2), (a)(5), and

(a)(8) that could arguably support an appeal, but ultimately, counsel concludes the appeal is frivolous.[8] **See Anders** Brief at 19 (stating, "the only arguable issue of merit is whether the trial court abused its discretion in finding that [CYS] presented clear and convincing evidence to terminate [Father's] parental rights, pursuant to [] Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8)"). Counsel also attached to his petition a letter to Father that fulfills the notice requirements of **Millisock**. Father has not filed a response to counsel's letter, the **Anders** brief, or the petition to withdraw. Accordingly, we proceed to conduct an independent review of the record to determine whether the appeal is wholly frivolous.

In his Rule 1925(b) statement, Father raised the following issues:

1. [Whether] he trial court erred by finding that there was clear and convincing evidence presented by [CYS] to involuntarily terminate [Father's] parental rights pursuant to [] Sections 2511(a)(1), (a)(2), (a)(5), and (a)(8)[?]

2. [Whether] the trial court erred by finding that involuntary termination of [Father's] parental rights was in the best interest of the [children pursuant to Section 2511(b)?]

Father's Rule 1925(b) Statement, 2/22/23.

In matters involving involuntary termination of parental rights, our standard of review is well-settled.

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and

---

[8] The **Anders** brief makes no mention of the trial court's failure to address whether CYS met its burden under Section 2511(b).

credibility determinations of the trial court if they are supported by the record." ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** "A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill[-]will." ***Id.*** The trial court's decision, however, should not be reversed merely because the record would support a different result. ***Id.*** at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. ***See In re R.J.T.***, 9 A.3d [1179, 1190 (Pa. 2010)].

***In re T.S.M.***, 71 A.3d 251, 267 (Pa. 2013) (original brackets omitted). "[T]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." ***In re Q.R.D.***, 214 A.3d 233, 239 (Pa. Super. 2019) (citation omitted). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." ***In re B.J.Z.***, 207 A.3d 914, 921 (Pa. Super. 2019) (citation omitted).[9]

The termination of parental rights is guided by Section 2511 of the Adoption Act, which requires a bifurcated analysis of the grounds for

_____

[9] As we stated *supra*, our disposition vacates the trial court's January 23, 2023 orders, denies counsel's petition to withdraw, and remands this matter for further proceedings. We reached this disposition because the trial court failed to determine whether CYS met its burden under Section 2511(b) and because counsel did not challenge this omission on appeal. To move matters along on remand, we have undertaken appellate review of the trial court's assessment under Section 2511(a)(5) and concluded that the trial court correctly determined that CYS met its burden under this provision. On remand, then, the trial court may concentrate its efforts on determining whether CYS met its burden under Section 2511(b), using the factors we identify *infra*.

termination followed by an assessment of the needs and welfare of the child. *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021) (stating, "[t]he time-tested law of the Commonwealth requires that we balance this intrinsic parental interest within the context of a child's essential needs for a parent's care, protection, and support").

> If the trial court finds clear and convincing evidence supporting the existence of one of the grounds for termination set forth in [Section] 2511(a), the [trial] court must then consider whether termination would best serve the developmental, physical[,] and emotional needs and welfare of the child under [Section] 2511(b).

*Id.* at 359 (citations and quotation marks omitted); *see also Interest of K.T.*, ___ A.3d ___, 2023 WL 4092986, at *13 (Pa. filed June 21, 2023) (slip opinion) (stating, "the party seeking termination must prove by clear and convincing evidence the existence of the statutory grounds for doing so, including that termination would best serve the child's needs and welfare pursuant Section 2511(b), in addition to termination grounds under [Section 2511(a)]" (citation and original quotation marks omitted)). "Clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier[-]of[-]fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 358 (citation, original quotation marks, and original brackets omitted). In weighing the factors in consideration of a termination petition, "courts must keep the ticking clock of childhood ever in mind[, as c]hildren are young for a scant number of years, and [courts] have an obligation to see to their healthy

development quickly." ***T.S.M.***, 71 A.3d at 269; ***see also In re I.J.***, 972 A.2d 5, 9 (Pa. Super. 2009) (stating, a child has a right to a stable, safe, and healthy environment in which to grow, and the "child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting").

Here, the trial court terminated Father's parental rights to S.A.M.S. and B.J.S. pursuant to Section 2511(a)(1), (a)(2), (a)(5), and (a)(8). Section 2511(a) provides, in pertinent part, as follows:

### § 2511. Grounds for involuntary termination

**(a) General rule.** - The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the

- 15 -

child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist[,] and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (a)(2), (a)(5) and (a)(8).

Once the trial court determines that involuntary termination of parental rights is warranted under Section 2511(a), **the trial court is required to engage in an analysis pursuant to Section 2511(b) to determine whether termination would best serve the developmental, physical, and emotional needs and welfare of the child**.  Section 2511(b) states,

**§ 2511.  Grounds for involuntary termination**

. . .

**(b)  Other considerations.** - The court in terminating the rights of a parent shall give primary consideration to the developmental, physical[,] and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing[,] and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

Our Supreme Court, in **K.T.**, **supra**, recently explained that "[t]he plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the 'primary consideration' must be the child's 'developmental, physical[,] and emotional needs and welfare[,]' thus, requiring the trial] court to focus on the child and consider all three categories of needs and welfare." **K.T.**, ____ A.3d ____, 2013 WL 4092986, at *13. "[T]he determination of [a] child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis." **Id.** at *14.

It is well-established that this Court need only agree with the trial court as to any one section of Section 2511(a), as well as Section 2511(b), in order to affirm an order or decree involuntarily terminating parental rights. **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Our review of the certified record confirms that CYS introduced clear and convincing evidence in support of termination pursuant to Section 2511(a)(5).

> Termination of parental rights under Section 2511(a)(5) requires that: (1) the child has been removed from parental care for at least six months; (2) the conditions which led to removal and placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

**In re C.B.**, 230 A.3d 341, 348 (Pa. Super. 2020), *appeal denied*, 234 A.3d 410 (Pa. 2020). In considering whether the conditions which led to removal and placement of the child continue to exist, courts should consider whether the parent cannot or will not remedy the conditions within a reasonable period

of time and whether the services reasonably available to the parent are unlikely to remedy the conditions within a reasonable period of time. *In re Adoption of M.E.P.*, 825 A.2d 1266, 1273 (Pa. Super. 2003).

In finding that CYS presented clear and convincing evidence in support of termination under Section 2511(a)(5), the trial court explained,

> [The children] have been in foster care since January [] 2021. The conditions that led to placement, Father's mental health and anger control issues, his failure to obtain safe and appropriate housing[,] and his lack of parenting skills and techniques, are very unlikely to be remedied. Even with the offer of services and assistance, Father continues to fail to remedy the conditions that necessitated placement of the children[,] and [the children] will face substantial risk of being abused again if returned to his care. It will be emotionally devasting to [both S.A.M.S. and B.J.S.] if [the children are] removed from [their respective foster care homes.] [Each set of foster parents] will adopt the [respective child in their care and custody] if that is an option. [The children have] a negative bond with Father. [The children do] not want to have contact with [Father] and very much want[] to be adopted by [their respective foster parents] and for Father's parental rights to be terminated. Therefore, there will be no detriment, and great benefit, to [the children] if [Father's] parental rights are terminated.

Trial Court Opinion (S.A.M.S.), 1/23/23, at 16; *see also* Trial Court Opinion (B.J.S.), 1/23/23, at 16.

The record demonstrates that the children were removed from Father's care and custody on January 13, 2021, due to allegations Father caused, *inter alia*, bodily injury to the children. N.T., 10/28/22, at 27-29, 33-34; *see also* CYS Exhibit 7; CYS Exhibit 8; CYS Exhibit 11. Specifically, Father "appl[ied] force to the neck of [S.A.M.S.], causing her to lose consciousness," and Father

struck B.J.S., "using his hands, fists, and feet." N.T., 1/9/23, at 5-6; *see also* CYS Exhibit 16, at 6. On December 10, 2021, Father pleaded guilty to 3 counts of simple assault (1 count each against S.A.M.S., B.J.S., and their brother), as well as 1 court of endangering the welfare of the children as a result of the events that lead to the removal of the children.[10] *See* CYS Exhibit 5. That same day, Father was sentenced to 1 to 2 years' incarceration and 3 years' probation, which was set to run concurrent to Father's term of incarceration.[11] *Id.* Father was incarcerated from December 10, 2021, to August 22, 2022.[12] *Id.*; *see also* N.T., 1/9/23, at 8-9.

After the children were declared dependent, the trial court ordered that Father complete the following requirements as part of his child permanency plan, which was developed to reunite the children with Father.

> Father shall obtain an updated mental health evaluation. The evaluator shall be provided a copy of the [trial] court's [dependency] findings regarding the abuse of the children. Father shall demonstrate that he recognizes the abuse that he [] caused to the children and [that he] is productively working to address [the abuse] and his anger management control issues in

---

[10] 18 Pa.C.S.A. §§ 2701(a)(1) and 4304(a)(1), respectively.

[11] As part of his sentence, Father was given credit of 50 days for time served. *See* CYS Exhibit 5.

[12] Due to criminal charges lodged against Father as a result of his acts of physical and mental harm against the children, Father remained in police custody from sometime in February 2021, to sometime in March 2021, whereupon Father was released after posting bail. N.T., 1/9/23, at 9. This period of incarceration accounts for the 50 days of credit for time served that Father received towards his overall sentence.

treatment. He shall sign all releases requested by CYS for his mental health records. Father shall also obtain an updated drug and alcohol evaluation[] and follow his recommended treatment plan, if any. Father shall demonstrate that he has an appropriate home that is clean and safe and appropriate for the return of the children.

CYS Exhibit 1-A, at Order of Adjudication and Disposition (2/26/21); **see also** N.T., 1/9/23, at 10 (stating that, Father's child permanency plan included his obligation "to maintain[ and] obtain stable, safe, appropriate housing[ and] follow through with mental health treatment"). As part of his parole conditions, Father was ordered to have no direct contact with the children.[13] N.T., 1/9/23, at 9.

Since the removal of the children from Father's care and custody in January 2021, three CYS caseworkers have been involved with Father and the children.[14] Fry was the primary caseworker assigned to Father and the children from January 2021, to August 2021.[15] Erica Solorio ("Solorio") was

---

[13] Father was permitted to write letters to the children. N.T., 1/9/23, at 9.

[14] The children have been under the care and custody of CYS as far back as 2009, due to Father's acts of endangering the welfare of the children, anger management issues, and assault towards other family members. N.T., 1/9/23, at 13; **see also** CYS Exhibit 1-A.

[15] Fry testified that, because of his service with the Pennsylvania National Guard, there were times where the dependency case was handled by other caseworkers. N.T., 10/28/22, at 46.

the primary caseworker from August 2021, to April 2022,[16] and Sarah Glover ("Glover") was the primary caseworker from April 2022, through the January 9, 2023 termination hearing.

Fry testified that he kept Father "up to date with the children" both before and after Father's 50-day period of post-arrest, pre-conviction incarceration in February and March 2021, due to Father's restriction that he have no direct contact with the children during the on-going criminal case. N.T., 10/28/22, at 44. Fry stated that, upon Father's release from jail (March 2021), he lived in a one bedroom apartment. *Id.* The medical records pertaining to Father's mental health evaluation on April 15, 2021, reveal notations from the evaluator that Father denied physically abusing the children and stated that "he would like to work on his anger issues." CYS Exhibit 13.

Solorio testified that, when she took over the dependency case in August 2021, Father lived in an apartment and that when she resigned as the primary caseworker in April 2022, Father resided with his parents. N.T., 10/28/22, at 69, 75. Solorio stated that Father, because he was unable to have direct contact with the children, would write the children letters, which she delivered to the children, and that he gave the children gifts *via* his parents. *Id.* at 71. Solorio stated that, as part of Father's child permanency plan, Father

---

[16] Solorio testified that she handled the dependency case for Fry "in the spring of 2021[,] while [Fry] was on military leave" before taking over the case as the primary caseworker in August 2021. N.T., 10/28/22, at 68.

underwent a drug and alcohol evaluation and, based upon that evaluation, no further treatment was recommended. *Id.* at 72. During Solorio's tenure as the primary caseworker, Father participated in mental health treatment, including treatment to address his anger management issues.[17] *Id.* at 72, 77-78.

Glover testified that, upon Father's release from jail, he lived in a one bedroom apartment, which she described as an efficiency apartment comprised of a single bedroom, a living room, a bathroom, and a kitchen. N.T., 1/9/23, 10-11. Glover stated that these living arrangements were not appropriate for the return of the children to Father and that there was no evidence, *i.e.* the presence of separate beds for the children, indicating that Father was prepared for the return of the children. *Id.* at 11. Glover stated that, during her tenure as the primary caseworker, she twice offered Father a housing case management referral for McKean County housing because of his current living situation, and in both instances, Father refused the referral, stating that "he's waiting to see if he gets the children back or not." *Id.* at 10, 19. Glover also testified that she has not received any medical records indicating that Father continued to engage in mental health treatment upon

---

[17] Solorio mistakenly testified that at the time she left her employment with CYS in March 2022, Father was no longer incarcerated and "was still working on getting housing." N.T., 10/28/22, at 68, 72. Father was not released from jail until August 2022. Solorio's testimony establishes that Father, after vacating his apartment, lived with his parents and worked to obtain adequate housing prior to his incarceration in December 2021.

his release from jail (August 2022). *Id.* at 11, 16. When asked what Father would need to achieve in order to reunite with the children, if the trial court were to grant Father additional time to overcome his obstacles, Glover responded that Father would need to, *inter alia*, "follow through with his mental health services," and "obtain[] housing that was appropriate for him and the children[.]" *Id.* at 13. Glover testified that, in her opinion, providing Father with additional time was not going to change anything because, ultimately, "[t]he children do not want to have contact with [Father]." *Id.* at 15-16. Glover stated that Father has not taken any proactive stance to address his mental health requirements and locate safe, stable, and appropriate housing for the children. *Id.* at 19, 27-28.

Finally, Father testified that he is not currently enrolled in a mental health treatment program, and stated that his last mental health evaluation was April 4, 2022. *Id.* at 31, 34. When asked about obtaining suitable housing, Father confirmed that Glover offered him housing case management services, but that he declined the assistance because "[he is] doing it all on [his] own." *Id.* at 32. Father explained that he has not obtained suitable housing, currently, but "if the [children] were given back to [him, he] would immediately find a place [that is] big enough for the [children and him."] *Id.* Father testified that if the trial court permitted him additional time, he would "reengage mental health" treatment and would be willing to accept assistance in locating suitable housing. *Id.* at 35. When asked about his prior anger management issues and the need to address those issues, Father responded,

"I never was found that I had any problems." *Id.* at 41, 43 (acknowledging that, he never received any anger management treatment).

Upon review, we concur with the trial court, and the record supports, that the conditions which led to the removal and placement of the children continue to exist, that Father cannot or will not remedy those conditions, and the services offered by CYS are not likely to remedy the conditions within a reasonable time period. 23 Pa.C.S.A. § 2511(a)(5). Father was required to participate in a mental health treatment program, specifically addressing his anger management issues, and obtain safe, stable, and suitable housing for the children. As of the January 9, 2023 termination hearing, Father is not currently enrolled in a mental health treatment program, is not addressing his anger management issues (nor does he believe such issues exist), and has not obtained appropriate housing. Rather, Father testified that he is waiting to see if he is granted custody of the children before working to obtain appropriate housing and to participate in a mental health treatment program.

We also concur with the trial court, and the record supports, that termination of Father's parental rights would best serve the needs and welfare of the children, as analyzed under Section 2511(a)(5). Both children currently live in safe, stable environments with foster parents who are able to provide parental care. Father continues to reside in housing that is not appropriate for the children, and he has not addressed his anger management issues, which have plagued this family for more than a decade. Because Father continues to forgo any mental health treatment addressing his anger

management issues, we concur with the trial court, and the record supports, that the children "face [a] substantial risk of being abused again if returned to [Father's] care." The children's lives, and the need for love, comfort, security, and stability, should not be held in abeyance while Father summons the ability and desire to overcome the obstacles which prevent reunification, nor would additional time aid Father in achieving his reunification requirements. On remand, the trial court need not revisit CYS' termination petitions to consider whether the agency met its burden under Section 2511(a).

Turning to our review of the second part of the trial court's two-part analysis under Section 2511, we find that the trial court failed to determine, pursuant to Section 2511(b), whether CYS presented clear and convincing evidence that termination of Father's parental rights would best serve the developmental, physical, and emotional needs and welfare of the children. *See* Trial Court Opinion (S.A.M.S.), 1/23/23; *see also* Trial Court Order, 1/23/23 (S.A.M.S.); Trial Court Opinion (B.J.S.), 1/23/23; *see also* Trial Court Order, 1/23/23 (B.J.S.); *K.T.*, ___ A.3d ___, 2023 WL 4092986, at *13. Although the trial court cites to Section 2511(b), as well as some case law, (*see* Trial Court Opinion (S.A.M.S.), 1/23/23, at 10-11; *see also* Trial Court Opinion (B.J.S.), 1/23/23, at 10-11), the trial court's orders terminating Father's parental rights to the children, and accompanying opinions, are devoid of a meaningful and analytical discussion of Section 2511(b) as applied

to the facts of the case *sub judice*.[18]  ***K.T.***, \_\_\_\_ A.3d \_\_\_\_, 2023 WL 4092986, at *14 (stating, "where there has not been adequate consideration of the emotional needs of the [child], a termination of parental rights cannot be sustained" (citation, original brackets, and original quotation marks omitted)).

As discussed *supra*, an analysis of Section 2511(b) and whether termination would best serve a child's needs and welfare must be made on a case-by-case basis.  ***Id.***  A trial court, in analyzing the facts of a particular case pursuant to Section 2511(b), must focus on the child and consider that child's developmental, physical, and emotional needs and welfare, from the child's perspective and above concerns for the parent.  ***Id.*** at *13.  The trial court must examine whether a bond exists between the child and the biological parent, who is the subject of the termination action.  ***Id.*** at 14.  If the trial court finds that such a bond exists, the trial court must then analyze that bond.  ***Id.***  Emphasizing the importance of permanency and stability, the trial court "must determine whether the trauma caused by breaking the parent-child bond is outweighed by the benefit of moving the child toward a permanent home."  ***Id.*** at *15 (citation and brackets omitted).  A trial court, in the context of a child's need for permanency, stability, and intangibles, such as love, comfort, and security, must consider whether the parent-child bond

---

[18] Where the trial court declares, without substantial elaboration, that the termination of Father's parental rights would best serve the needs and welfare of the children, the trial court does so in the context of considering termination under Sections 2511(a)(5) and 2511(a)(8).

is "necessary and beneficial" to the child. *Id.* at *16 (stating, "[i]t is only a necessary and beneficial bond, after all, that should be maintained when Section 2511(b) mandates the child's needs and welfare are of 'primary' importance").

> Severance of a "necessary and beneficial" bond would predictably cause more than the "adverse" impact that, unfortunately, may occur whenever a bond is present. By contrast, severance of a necessary and beneficial relationship is the kind of loss that would predictably cause "extreme emotional consequences" or significant, irreparable harm.

*Id.* (footnote omitted). When a parent-child bond is found to exist, "there must be clear and convincing evidence that the [parent-child] bond is not necessary and beneficial." *Id.* at 19.

In addition to considering the child's bond with the biological parent, if such a bond is found to exist, the trial court must "also examine the intangibles such as the love, comfort, security, and stability the child might have with the **foster** parent." *Id.* at *17 (original quotation marks omitted, emphasis in original). The trial court must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a pre[-]adoptive home and bonded with [the] foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including [the] intangible needs of love, comfort, security, safety, and stability." *Id.* at *18 (citations and footnote omitted).

Thus, the **K.T.** Court set forth 4 essential and absolute factors a trial court must consider as part of its Section 2511(b) analysis, as follows: (1)

whether the child is in a pre-adoptive home; (2) whether the child bonded with his or her foster parent; (3) whether the child has a bond with his or her biological parent; and (4) if a biological parent-child bond exists, whether maintaining that bond is "necessary and beneficial" to the child in the context of permanency, stability, and intangibles needs (love, comfort, and security). This list of mandatory factors that a trial court must consider, if present in the record, is not exhaustive, and the trial court is free to consider additional information that is relevant to its inquiry. *Id.* at *18, n.28. As always, the trial court has "the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs." *Id.* at *18.

Instantly, we are constrained to remand the case *sub judice* so the trial court may perform a Section 2511(b) analysis, keeping in mind the guidance recently provided by our Supreme Court in *K.T.*, *supra*. As such, we deny Attorney Martini's petition to withdraw as counsel for Father.

Orders vacated. Petition denied. Case remanded. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/21/2023

- 28 -